# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC., <br><br> Plaintiff, <br><br> - v. - <br><br> NATIONAL MEDIATION BOARD, <br><br> Defendant. | CIVIL ACTION <br> No. 10-CV-804 (PLF) <br><br> MOTION FOR PRELIMINARY INJUNCTION <br><br> ORAL ARGUMENT REQUESTED <br><br> EXPEDITED BRIEFING AND CONSIDERATION REQUESTED |

## AIR TRANSPORT ASSOCIATION OF AMERICA, INC.'s MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule of Civil Procedure 65.1(c), the Air Transport Association of America, Inc. ("ATA"), through counsel, respectfully moves for a preliminary injunction pending expedited discovery and an expedited final hearing on the merits, to stay the effective date of the rule change announced by the National Mediation Board ("Board") on May 11, 2010, in Docket No. C-6964.  ATA has separately filed a complaint challenging the rule change as a violation of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, and as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 550 *et seq*.  As set forth more fully in ATA's Memorandum of Points and Authorities in Support of its Motion, a preliminary injunction is warranted because (1) ATA is likely to prevail on its RLA and APA claims, (2) the participating ATA member air carriers would suffer irreparable injury if a preliminary injunction were denied, and (3) the public interest weighs in favor of the injunction.

The duration of any injunction will be minimal.  The ATA seeks only minimal discovery before this case is set for a final hearing on the merits, and only with respect to the facts

demonstrating that the Board majority did not have an open mind and predetermined the issues. The ATA has filed a motion with the Court seeking expedited discovery, beginning immediately, so that a final hearing on the merits can be held within 60 days of the entry of a preliminary injunction.  After 75 years of application of the majority rule, there can be no meaningful harm from a preliminary junction of 60 days duration.

As required by Local Rule 7(m), ATA has conferred with legal counsel for the Board regarding this motion.  The Board opposes the relief sought herein.  The Board opposes ATA's request for a preliminary injunction.  The Board does not believe that an expedited hearing on the motion for preliminary injunction is warranted, but if the Court grants ATA's request for hearing within 21 days pursuant to Local Rule 65(d), counsel for the Board is available for the hearing on June 3, 2010.  Counsel for the Board also indicated that the Board will not stay the effective date of the final rule pending resolution of this action.

In light of the importance and complexity of the issues presented in this case, ATA requests an oral hearing on this motion.  *See* LCvR 7(f).  Moreover, pursuant to Local Rule 65.1(d), ATA requests that the Court schedule a hearing on this application for a preliminary injunction within 21 days (before June 10, 2010).

Because a preliminary injunction would threaten no costs or damages to the Board, ATA requests that bond be set at $1.  Fed. R. Civ. P. 65(c).

Dated:  May 19, 2010                          Respectfully Submitted,


                                              /s/ Robert A. Siegel
                                              Robert A. Siegel*
                                              O'MELVENY & MYERS LLP
                                              400 South Hope St.
                                              Los Angeles, CA 90081-2899
                                              (213) 430-6000 (telephone)
                                              (213) 430-6407 (facsimile)

Chris A. Hollinger**
O'MELVENY & MYERS LLP
2 Embarcadero Center
San Francisco, CA 94111-3823
(415) 984-8700 (telephone)
(415) 984-8701 (facsimile)

/s/ Stephen D. Brody
Stephen D. Brody (DC Bar No. 459263)
Irv Gornstein (DC Bar No. 345751)*
Micah W.J. Smith (DC Bar. No. 988330)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006-4001
(202) 383-5300 (telephone)
(202) 383-5414 (facsimile)

*Counsel for Plaintiff Air Transport
Association of America, Inc.*

*admitted pro hac vice
**pro hac vice motion pending

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May, 2010, a true and accurate copy of the foregoing motion, supporting memorandum, and proposed order was served via the Court's electronic filing system and by electronic mail to:

### *Attorneys for Defendant National Mediation Board*

Tamra T. Moore, Esquire
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Tamra.Moore@usdoj.gov

Thomas D. Zimpleman, Esquire
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Thomas.D.Zimpleman@usdoj.gov

### *Attorney for Intervenors-Plaintiffs Ashton Therrel* **et al.**

Glenn M. Taubman, Esquire
c/o National Right to Work Legal Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, VA 22160
gmt@nrtw.org

/s/ Robert A. Siegel
Robert A. Siegel
of O'Melveny & Myers LLP

/s/ Stephen D. Brody
Stephen D. Brody
of O'Melveny & Myers LLP

### UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | |
|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC., <br><br>         Plaintiff, <br><br> - v. - <br><br> NATIONAL MEDIATION BOARD, <br><br>         Defendant. | CIVIL ACTION <br> No. 10-CV-804 (PLF) <br><br> MOTION FOR PRELIMINARY INJUNCTION <br><br> ORAL ARGUMENT REQUESTED <br><br> EXPEDITED BRIEFING AND CONSIDERATION REQUESTED |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE AIR TRANSPORT ASSOCIATION OF AMERICA INC.'s MOTION FOR A PRELIMINARY INJUNCTION

Robert A. Siegel*
O'MELVENY & MYERS LLP
400 South Hope St.
Los Angeles, CA 90081-2899
(213) 430-6000 (telephone)
(213) 430-6407 (facsimile)


Chris A. Hollinger**
O'MELVENY & MYERS LLP
2 Embarcadero Center
San Francisco, CA 94111-3823
(415) 984-8700 (telephone)
(415) 984-8701 (facsimile)

Stephen Brody (DC Bar No. 459263)
Irv Gornstein (DC Bar No. 345751)*
Micah W.J. Smith (DC Bar. No. 988330)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006-4001
(202) 383-5300 (telephone)
(202) 383-5414 (facsimile)

*Counsel for Plaintiff Air Transport Association of America, Inc.*

*admitted pro hac vice*
**pro hac vice motion pending*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF THE CASE.............................................................................1

    A.    The Parties ...............................................................................................1

    B.    Factual and Legal Background .................................................................2

    C.    This Lawsuit.............................................................................................7

    D.    Jurisdiction and Cause of Action ............................................................7

    E.    Standards for Granting Preliminary Injunction.......................................8

ARGUMENT ........................................................................................................9

I.    THE BOARD'S ATTEMPT TO ABANDON THE MAJORITY RULE VIOLATES BOTH THE RLA AND THE APA .......................................................................9

    A.    The Board's Minority Rule Is Not In Accordance With Law, And Thus Violates The APA, Because The RLA Prohibits The Board From Allowing A Minority Of A Craft Or Class To Select A Representative............................................9

            1.    The Minority Rule Conflicts with the RLA's Plain Text .........................10

            2.    The Minority Rule Is an Unreasonable Construction of the RLA ............18

    B.    The Board's Rule Change Is Arbitrary And Capricious.......................................19

            1.    The Board Has Offered No Neutral and Rational Basis, Much Less the Compelling Reasons Required by Its Precedent, For Abandoning the Majority Rule ...............................................................................................19

            2.    The Board's Refusal to Adopt a Parallel Decertification Procedure Is Arbitrary and Capricious.........................................................................28

            3.    The Board's Refusal to Allow a "No Union" Option During Run-Off Elections Arbitrarily Discriminates in Favor of Unionization...................31

            4.    The Board Abandoned its Majority Rule Without the Evidentiary Hearing Required by its Precedent .........................................................................32

            5.    The Board's Majority Has Predetermined The Issues ...............................35

II.    THE PARTICIPATING ATA MEMBERS WOULD SUFFER IRREPARABLE INJURY IF THE MOTION FOR A PRELIMINARY INJUNCTION WERE DENIED ...............40

III.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION.............................................................................42

CONCLUSION....................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allentown Mack Sales & Serv. v. NLRB*,
  522 U.S. 359 (1998).................................................................................. 19, 35

*Ass'n of Nat'l Advertisers v. FTC*,
  627 F.2d 1151 (D.C. Cir. 1979)................................................................. 35, 37

*Bhd. of Ry. & Steamship Clerks, Freight Handlers, Express & Station Employees v. Ass'n for
  Benefit of Non-Contract Employees*,
  380 U.S. 650 (1965)................................................................................ passim

*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009).................................................................... 9

*Carroll County v. Smith*,
  111 U.S. 556 (1884).................................................................................... 17

*CBS v. FCC*,
  454 F.2d 1018 (D.C. Cir. 1971).................................................................... 28

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006).................................................................... 8, 9

*Chevron USA, Inc. v. Natural Resources Defense Council*,
  467 U.S. 837 (1984)................................................................................ 9, 18

*Cinderella Career & Finishing Schs. v. FTC*,
  425 F.2d 583 (D.C. Cir. 1970)...................................................................... 35

*Continental Airlines, Inc. v. NMB*,
  793 F. Supp. 330 (D.D.C. 1991).................................................................... 14

*FCC v. Fox TV Stations*,
  129 S. Ct. 1800 (2009)................................................................. 20, 26, 33, 35

*Gardner v. FCC*,
  530 F.2d 1086 (D.C. Cir. 1976).................................................................... 33

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002)...................................................................... 33

*INS v. Yang*,
  519 U.S. 26 (1996).................................................................................... 27

*International Brotherhood of Teamsters v. Brotherhood of Railway, Airline & Steamship Clerks*,
  402 F.2d 196 (D.C. Cir. 1968)...................................................................... 14

*La. Pub. Serv. Comm'n v. FERC*,
  184 F.3d 892 (D.C. Cir. 1999)................................................................. 20, 26

*Landstar Express Am., Inc. v. Fed. Maritime Comm'n*,
  569 F.3d 493, 500 (D.C. Cir. 2009)........................................................... 10, 18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Montgomery County Fiscal Court v. Trimble*,
   47 S.W. 773 (Ky. 1898) ................................................................................ 17

*Nat'l Fed'n of Fed. Employees v. FLRA*,
   412 F.3d 119 (D.C. Cir. 2005) ...................................................................... 23

*Nat'l Treasury Employees Union v. FLRA*,
   550 F.3d 1148 (D.C. Cir. 2008) ............................................................. 27, 33

*Nken v. Holder*,
   129 S. Ct. 1749 (2009) .................................................................................... 8

*NLRB v. Standard Lime & Stone Co.*,
   149 F.2d 435 (4th Cir. 1945) ........................................................................ 16

*Ramaprakash v. FAA*,
   346 F.3d 1121 (D.C. Cir. 2003) .................................................................... 26

*Russell v. NMB*,
   714 F.2d 1332 (5th Cir. 1983) ...................................................................... 29

*Ry. Labor Executives' Ass'n v. NMB ("RLEA")*,
   29 F.3d 655 (D.C. Cir. 1994) .......................................................................... 8

*St. Joseph Twp. v. Rogers*,
   83 U.S. 644 (1873) ........................................................................................ 17

*Sys. Fed'n No. 40 v. Virginian Ry. Co.*,
   11 F. Supp. 621 (E.D. Va 1935) ................................................................... 14

*Teamsters v. Bhd. of Ry. Airline & Steamship Clerks ("BRAC")*,
   402 F.2d 196 (D.C. Cir. 1968) ................................................................ 17, 29

*Trans World Airlines v. Indep. Fed'n of Flight Attendants*,
   489 U.S. 426 (1989) ...................................................................................... 15

*Ullmann v. United States*,
   350 U.S. 422 (1956) ...................................................................................... 11

*United States v. Gonzales*,
   520 U.S. 1 (1996) .......................................................................................... 13

*US Airways, Inc. v. NMB*,
   177 F.3d 985 (D.C. Cir. 1999) .......................................................... 2, 8, 16, 35

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
   259 F.2d 921 (D.C. Cir. 1958) ...................................................................... 41

*Venetian Casino Resort, L.L.C. v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ................................................................ 29, 32

*Virginian Railway Co. v. System Federation No. 40*,
   300 U.S. 515 (1937) ......................................................................... 13, 23, 24, 41

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Wash. Metro. Area Transit Comm'n v. Holiday Tours*,
    559 F.2d 841 (D.C. Cir. 1977) ................................................................. 41

*Zantop Int'l Airlines v. NMB*,
    732 F.2d 517 (6th Cir. 1984) ..................................................................... 8

**Statutes and Constitutional Provisions**

28 U.S.C. § 1331 ............................................................................................ 7

29 U.S.C. § 159(a) ....................................................................................... 15

45 U.S.C. § 151a .................................................................................... 23, 24

45 U.S.C. § 151a(1) ..................................................................................... 20

45 U.S.C. § 152, Fourth ................................................................. 2, 3, 10, 11

45 U.S.C. § 152, Ninth .............................................................................. 2, 37

45 U.S.C. § 154, First .................................................................................... 2

5 U.S.C. § 704 ................................................................................................ 7

5 U.S.C. § 705 ................................................................................................ 8

5 U.S.C. § 706 .............................................................................................. 32

5 U.S.C. § 706(2)(A) ................................................................................ 7, 18

5 U.S.C. § 706(2)(E) ................................................................................ 7, 18

5 U.S.C. § 706(2) ........................................................................................... 7

Cal. Elec. Code § 15452 (2009) .................................................................. 16

Fla. Const. art. VI, § 1 .................................................................................. 16

Ga. Code Ann. § 21-2-501 (2009) ............................................................... 16

NIRA, ch. 90, tit. I, § 7(a), 48 Stat. 195, 198 (June 16, 1933) .................... 15

Railway Labor Act § 2, Fourth ...................................................................... 3

S.D. Const. art. 26, § 9 ................................................................................. 16

Tenn. Const. art. III, § 2 ............................................................................... 16

Tex. Elec. Code Ann. § 2.001 (2009) .......................................................... 16

**Regulations**

29 C.F.R. § 1202.4 ......................................................................................... 6

29 C.F.R. § 1206.2(a) .............................................................................. 16, 27

29 C.F.R. § 1206.2(b) ................................................................................... 28

29 C.F.R. § 1206.4 ......................................................................................... 6

NLRB Rules and Regulations and Statements of Procedure § 101.18 (2002) ...... 16, 29

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

Notice of Final Rulemaking , Docket No. C-6964,
   75 Fed. Reg. 26,062, 26,075/2 (May 11, 2010) .............................................................. passim

Notice of Proposed Rulemaking, Docket No. C-6964,
   74 Fed. Reg. 56,750 (Nov. 3, 2009) ........................................................................... 4, 6, 33

**Administrative Case Law**

*Chamber of Commerce of the U.S.,*
   14 N.M.B. 347 (1987).................................................................................................. passim

Decision No. 119, *Int'l Ass'n of Machinists v. Atchison, T. & S.F. Ry.,*
   2 Dec. U.S. Railroad Labor Bd. 96 (Apr. 14, 1921) ................................................... 12

Decision No. 1971, *Bhd. of Railway & S.S. Clerks v. S. Pac. Lines,*
   4 Dec. U.S. Railway Labor Board 625 (Sept. 21, 1923) ............................................ 12

*Delta Air Lines,*
   35 N.M.B. 129 (2008)................................................................................................... passim

In re Chamber of Commerce of the U.S.,
   13 N.M.B. 90 (1986)..................................................................................................... 32

In re Chi., Ft. Wayne & E. R.R.,
   37 N.M.B. 23 (Nov. 4, 2009) ....................................................................................... 36

In re Compass Airlines,
   37 N.M.B. 63 (Nov. 19, 2009) ..................................................................................... 36

In re Liberty Helicopters, Inc.,
   37 N.M.B. 33 (Nov. 13, 2009) ..................................................................................... 36

In re N. Am. Airlines,
   37 N.M.B. 79 (Dec. 3, 2009) ........................................................................................ 36

In re Petition of the Chamber of Commerce of the U.S. Requesting the Amendment of the Bd.
   Rules Pursuant to 29 C.F.R. § 1206.8(b),
   12 N.M.B. 326 (Sept. 12, 1985)................................................................................... 4

In re Port Auth. Trans-Hudson Corp.,
   37 N.M.B. 75 (Dec. 1, 2009) ........................................................................................ 36

In re USA 3000 Airlines,
   37 N.M.B. 1 (Oct. 7, 2009) ........................................................................................... 36

Key Airline,
   13 N.M.B. 153 (1986)................................................................................................... 24

Laker Airways,
   8 N.M.B. 236 (1981)...................................................................................................... 24

Lemco Constr., Inc. & Int'l Bhd. of Elec. Workers,
   283 N.L.R.B. 459 (Apr. 14, 1987) ............................................................................... 15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Northwest Airlines, Inc./Delta Air Lines, Inc.,*
  37 N.M.B. 88 (Dec. 22, 2009) ................................................................................ 36

*Pan Am. Airways,*
  1 N.M.B. 454 (1948)............................................................................................ 20, 22

**Other Authorities**

John Bouvier, *A Law Dictionary,*
  *Adapted to the Constitution and Laws of the United States* 483 (1856) ................................... 11

*Railway Clerk, in Official Journal of Brotherhood of Railway and Steamship Clerks, Freight
  Handlers, Express and Station Employees* at 473 (Dec. 1935) ......................................... 22, 23

Hearing Before The House Committee on Interstate and Foreign Commerce, 73d Cong. 34-35
  (May 22, 1934) ..................................................................................................... 13

S. Rep. No. 73-1065, at 2 (1934) ............................................................................... 12

S. Rep. No. 81-2262, at 2 (1950)................................................................................ 25

## INTRODUCTION

This Court should issue a preliminary injunction, pending expedited discovery and an expedited final hearing on the merits, against the enforcement of the National Mediation Board's ("NMB" or "Board") final rule that abandons the Board's 75-year old *majority* voting rule and replaces it with a rule under which a *minority* of a craft or class has the right to select a union as a representative under the Railway Labor Act ("RLA").  All the requisites for a preliminary injunction are satisfied.  There is a substantial likelihood that the court will vacate the rule both because it violates the RLA's textual requirement that the "majority" of a "craft or class" has the "right" to select a representative, and because the rule is arbitrary, capricious, and not otherwise in accordance with law, in violation of the Administrative Procedure Act ("APA").  A preliminary injunction is necessary to prevent the irreparable injury that will occur in holding elections and issuing representation certifications under the new unlawful rule pending judicial review.  And given that the majority rule has been in effect for 75 years, the public interest favors continuing to hold elections under that rule while the validity of the Board's new rule is under review.

## STATEMENT OF THE CASE

**A.      The Parties.**

Plaintiff, the Air Transport Association of America, Inc. ("ATA"), is the principal trade association representing scheduled airlines in the United States.[1]  Decl. of David A. Berg ¶ 6 ("Berg Decl.").  The ATA's members and affiliated airlines account for more than 90% of

---

[1] The ATA's members are:  ABX Air, Inc.; AirTran Airways; Alaska Airlines, Inc.; American Airlines, Inc.; ASTAR Air Cargo, Inc.; Atlas Air, Inc.; Continental Airlines, Inc.; Delta Air Lines, Inc.; Evergreen International Airlines, Inc.; Federal Express Corporation; Hawaiian Airlines; JetBlue Airways Corp.; Southwest Airlines Co.; United Air Lines, Inc.; UPS Airlines; and US Airways, Inc.  The following ATA members do not join in this lawsuit: American Airlines, Inc., Continental Airlines, Inc., Southwest Airlines Co., UPS Airlines, United Air Lines, Inc. and US Airways, Inc.

passenger and cargo traffic on U.S. airlines, and more than 300,000 full-time equivalent airline-industry jobs.  *Id.* ¶ 7.  Labor relations for the ATA's members are governed by the RLA.  Since 1935 unions in the airline and railway industries have had a 68% success rate in RLA elections.  Notice of Final Rulemaking in Docket No. C-6964, 75 Fed. Reg. 26,062, 26,075/2 (May 11, 2010) (attached to Decl. of Micah W.J. Smith In Connection With ATA's Mot. for a Preliminary Injunction ("Smith Decl.") as Ex. B).  The ATA's members include airlines whose employees are currently, or in the near future will be, the subject of union organizing campaigns under which labor organizations seek to obtain certification to become the exclusive representative of work groups for purposes of collective bargaining.  Berg Decl. ¶¶ 8-9.

Defendant, the NMB, is an agency of the United States Government established to be a non-partisan mediator between carriers and labor organizations.  *See US Airways, Inc. v. NMB*, 177 F.3d 985, 989 n.2 (D.C. Cir. 1999).  In addition to its critical mediation function, the Board is responsible for the administration of union representation elections under the RLA.  The NMB's exercise of its representation function is governed by, *inter alia*, Sections 2, Fourth, and 2, Ninth, of the RLA.  45 U.S.C. §§ 152, Fourth, Ninth.  The NMB has three Members.  45 U.S.C. § 154, First.  Currently, the NMB's Chairman is Elizabeth Dougherty, and the other two Members are Harry Hoglander and Linda Puchala.  Chairman Dougherty was nominated by then-President Bush and confirmed in 2006.  Ms. Puchala is the newest Member of the NMB.  Ms. Puchala was nominated by President Obama, and sworn into office on or about May 26, 2009.  Mr. Hoglander, who had already been serving as an NMB Member, was re-confirmed on or about July 24, 2009 after his re-nomination by President Obama.

## B.    Factual and Legal Background.

Throughout its entire 75-year history, the NMB has conducted union representation elections according to the principle that a union would be certified as the collective bargaining

representative only if it had obtained majority support, *i.e.*, when a majority of the employees in the relevant "craft or class" voted in favor of union representation.  This "majority rule" is derived directly from the text of the RLA, which provides that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter."  RLA § 2, Fourth; 45 U.S.C. § 152, Fourth.  Under that rule, employees are given directions to fill out a ballot if they favor the selection of a union, and to refrain from voting if they do not.  *See Bhd. of Ry. & Steamship Clerks, Freight Handlers, Express & Station Employees v. Ass'n for Benefit of Non-Contract Employees ("ABNE")*, 380 U.S. 650, 670 (1965).

Over the years, the NMB has been asked to abandon the majority rule in favor of a "minority rule"—that is, an election process under which a union would be certified as the collective bargaining representative based on a majority of the votes cast, even if far less than a majority of eligible employees voted in favor of union representation.  But the NMB has consistently and emphatically rejected such requests.  *See, e.g.*, *Chamber of Commerce of the U.S.*, 14 N.M.B. 347, 362 (1987); *Delta Air Lines*, 35 N.M.B. 129 (2008).  Indeed, the NMB has explicitly recognized that only Congress has the authority to discard the majority rule.  Minutes of National Mediation Board Meeting, at 78-15 (June 7, 1978) (attached to Smith Decl. as Ex. I).

Nonetheless, on November 3, 2009, only a few months after the change in its composition caused by the confirmation of Ms. Puchala and re-confirmation of Mr. Hoglander, the NMB issued a Notice of Proposed Rulemaking in Docket No. C-6964, 74 Fed. Reg. 56,750 (Nov. 3, 2009) (the "NPRM") (attached to Smith Decl. as Ex. A), in which the NMB signaled its intention to abandon its 75-year-old statutorily required majority rule, and to replace it with a minority rule.  Indeed, in a sharp departure from the Board's earlier approach, the NPRM sought

to justify the change by attempting to refute preliminary objections to the proposed rule change. The last time the Board considered changing its voting rules on an industry-wide basis, it issued a neutral invitation for participation and comment. *In re Petition of the Chamber of Commerce of the U.S. Requesting the Amendment of the Bd. Rules Pursuant to 29 C.F.R. § 1206.8(b)*, 12 N.M.B. 326 (Sept. 12, 1985) (Notice of Hearing). Moreover, Members Hoglander and Puchala published the NPRM by means of an improper internal process in which they did not include Chairman Dougherty in any discussions prior to proposing the rulemaking and then attempted to prevent her from publishing a dissent from the NPRM. The Board majority's "exclusionary behavior" was detailed in a letter from Chairman Dougherty to certain Senators. *See* Letter from Chairman Dougherty to Senators McConnell, Isakson, Roberts, Coburn, Gregg, Enzi, Hatch, Alexander, and Burr (Nov. 2, 2009) ("Dougherty Nov. 2, 2009 Letter") (attached to Smith Decl. as Ex. H).

The NPRM was issued in response to the AFL-CIO's Transportation Trades Department's ("TTD") two-page letter to the Board dated September 2, 2009, which was largely devoid of any analysis, but which requested an industry-wide abandonment of the majority rule. At that time, both the Association of Flight Attendants-CWA ("AFA") and the International Association of Machinists and Aerospace Workers (the "IAM") had representation applications for employees of Delta Air Lines, Inc. ("Delta") pending with the NMB. The work groups that AFA and IAM were seeking to represent at Delta included large numbers of employees. Although the Board continued to process other representation applications and to schedule elections under the majority rule,[2] it delayed action on AFA's and IAM's applications at Delta.

---

[2] *See, e.g., In re N. Am. Airlines*, 37 N.M.B. 79 (Dec. 3, 2009) (certifying the results of an election that was requested on September 22, 2009); *In re Port Auth. Trans-Hudson Corp.*, 37 N.M.B. 75 (Dec. 1, 2009) (certifying the results of an election that was requested on July 14, 2009); *In re Compass Airlines*, 37 N.M.B. 63 (Nov. 19, 2009) (certifying the results of an election that was requested by the

IAM then withdrew its principal application at Delta three business days *before* the Board's majority issued the NPRM.[3]  AFA withdrew its application the day the NPRM was issued based on its publicly announced confidence that the Board would adopt the rule the Board's majority had proposed.  75 Fed. Reg. at 26,083 n.2 (Chairman Dougherty, dissenting).

On September 10, 2009—after the TTD's letter was filed but before the issuance of the NPRM—the ATA submitted a letter to the NMB in which it noted that the NMB lacked authority to abandon the majority rule, and that, based on its 2008 decision in *Delta Air Lines,* if the NMB were to consider granting the TTD's request to adopt the minority rule, it must utilize the briefing and evidentiary hearing process required by the Board's precedent.  *See* ATA, Airline Industry Preliminary Response to Unions' Request for Fundamental Change to Majority Rule Voting Process (Sept. 10, 2009) ("ATA Sept. 10, 2009 Letter") (attached to Smith Decl. as Ex. D).  In addition, both ATA and the U.S. Chamber of Commerce ("Chamber") reminded the Board that abandonment of the majority rule would necessarily require other changes to interrelated aspects of the NMB's election procedures—the most significant being the need to authorize a parallel decertification procedure.  The NMB did not respond to the ATA's September 10, 2009 letter.

Instead of providing the evidentiary hearing process required by the Board's precedents and requested in the ATA's September 10, 2009 letter, the NPRM provided only a 60-day

---

AFA on September 22, 2009); *In re Liberty Helicopters, Inc.*, 37 N.M.B. 33 (Nov. 13, 2009) (certifying the results of an election that was requested on September 3, 2009); *In re Chi., Ft. Wayne & E. R.R.*, 37 N.M.B. 23 (Nov. 4, 2009) (certifying the results of an election that was requested on September 2, 2009); *In re USA 3000 Airlines*, 37 N.M.B. 1 (Oct. 7, 2009) (certifying the results of an election that was requested by the AFA on August 7, 2009).

[3] IAM withdrew its application to represent employees in the fleet service craft or class, which comprised more than 13,000 employees.  IAM did not withdraw a separate application to represent employees in the simulator technician craft or class, which comprised 91 employees.  *See Delta Air Lines, Inc.*, 37 N.M.B. 142, 143 (Mar. 1, 2010).

notice-and-comment period, which closed on January 4, 2010.  The Board also conducted a limited public "meeting" on December 7, 2009, but did not offer an opportunity for cross-examination of witnesses under oath or for rebuttal.  Moreover, the Board majority's NPRM called for consideration of the minority rule in isolation, and did not even acknowledge the ATA's request for consideration of a parallel process for decertification, even though Chairman Dougherty, in dissent, explained that any proposal to abandon the Majority Rule would "necessitate[] some sort of decertification mechanism or else it deprives employees of the right to be unrepresented,"  74 Fed. Reg. at 56,754/1.

ATA submitted a comment letter and participated in the December 7, 2009 "meeting." *See* ATA, Comments Re: Notice of Proposed Rulemaking in Docket No. C-6964 (Jan. 4, 2010) (attached to Smith Decl. as Ex. E).  On January 8, 2010, certain members of ATA also moved to disqualify Members Hoglander and Puchala, based on publicly available facts—including the Board's exclusion of Chairman Dougherty from internal deliberations over the NPRM—demonstrating that those Members had impermissibly predetermined the issues.  *See* ATA, Motion for Disqualification of Members Hoglander and Puchala in Docket No. C-6964 (Jan. 8, 2010) ("Motion for Disqualification") (attached to Smith Decl. as Ex. F).

On May 11, 2010, the NMB issued a Notice of Final Rulemaking in which it denied the Motion for Disqualification and adopted the proposed minority rule.  *See* 75 Fed. Reg. 26,062 (to be codified at 29 C.F.R. §§ 1202.4, 1206.4).  Chairman Dougherty filed a dissent.  *See id.* at 26,083.  Without identifying any relevant change in circumstances, and without adopting any equivalent decertification process, the Board abandoned its majority rule.  In its place, the Board simply adopted its proposed rule "to determine the craft or class representative by a majority of valid ballots cast and [to] provide employees with an opportunity to vote 'no' or against union

representation." 75 Fed. Reg. at 26,063/1. And the Board indicated that its new minority rule

will become effective on June 10, 2010, which is the first business day after the 30-day waiting

period required by the APA, 5 U.S.C. § 553(d), and that the Board will use the minority rule in

elections arising from representation applications filed on or after June 10, 2010. 75 Fed. Reg. at

26,083. The Board's adoption of the minority rule was hardly surprising, given that Members

Hoglander and Puchala had already committed themselves to changing the rule.

**C.      This Lawsuit.**

On May 17, 2010, ATA filed a two-count complaint with this Court, seeking declaratory

and injunctive relief against the NMB. Count I of ATA's complaint alleges that the Board's

minority rule violates the RLA and thus is not in accordance with law under the APA. In Count

II of its complaint, ATA alleges that the NMB's adoption of the minority rule is arbitrary,

capricious, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2), because

(i) there is no legitimate justification for the NMB's dramatic departure from longstanding

practice, (ii) the NMB has arbitrarily discriminated against employees who do not want a union

by reversing its voting rule while refusing to adopt equivalent decertification and run-off

procedures, (iii) the NMB failed to provide an evidentiary hearing process to consider the NPRM,

and (iv) Members Hoglander and Puchala predetermined the issues raised in the NPRM.

Pursuant to Local Rule 65.1(d), ATA has requested that the Court schedule a hearing on

its motion for preliminary injunction no later than June 9, 2010, the day before the challenged

rule is scheduled to go into effect. ATA has also filed a motion for an expedited hearing date,

which seeks a final hearing on the merits within 60 days of the Court's ruling on the motion.

**D.      Jurisdiction and Cause of Action.**

This Court has jurisdiction under 28 U.S.C. § 1331. The ATA's claim that the minority

rule violates the RLA arises under APA. 5 U.S.C. §§ 704, 706(2)(A). Its claims that the rule is

arbitrary, capricious, and not otherwise in accordance with law also arise under the APA.  5

U.S.C. §§ 704, 706(2)(A), (E); *Ry. Labor Executives' Ass'n v. NMB ("RLEA")*, 29 F.3d 655, 659

n.1, 672-73 (D.C. Cir. 1994) (en banc); *accord US Airways*, 177 F.3d at 989 n.2.

ATA and its members have standing to bring this lawsuit.  The question whether

employees retain, or choose to return to, non-union status, and thus interact with their employer

on a direct and individualized basis, or instead become legally bound to interact with their

employer only through a labor organization with respect to rates of pay, rules, and working

conditions, has a profound impact on the relationships between an employer and its employees.

Berg Decl. ¶¶ 5, 8, 11.  As such, ATA's members have a direct and concrete interest in the rules

governing RLA union representation elections and, in particular, the rules establishing the

proportion of votes needed by a union to be certified as a collective bargaining representative.

*See, e.g.*, *Zantop Int'l Airlines v. NMB*, 732 F.2d 517, 520 (6th Cir. 1984) (carrier has standing to

challenge Board's administration of representation elections (citing cases)).

E.      **Standards for Granting Preliminary Injunction.**

The legal standard governing preliminary injunctions is well-settled.  Under the APA, a

court may "postpone the effective date of an agency action" in order "to prevent irreparable

injury."  5 U.S.C. § 705.  In deciding whether to grant a preliminary injunction, courts consider

whether the movant has shown "(1) a substantial likelihood of success on the merits, (2) that it

would suffer irreparable injury if the injunction were not granted, (3) that an injunction would

not substantially injure other interested parties, and (4) that the public interest would be furthered

by the injunction."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.

Cir. 2006).  As the Supreme Court has recently explained, harm to the opposing party and a

consideration of the public interest "merge when the Government is the opposing party."  *Nken v.

Holder*, 129 S. Ct. 1749, 1762 (2009).  In considering these factors, "district courts may employ

a sliding scale under which a particularly strong showing in one area can compensate for weakness in another," *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 11-12 (D.D.C. 2009) (citing *England*, 454 F.3d at 297), so long as the movant shows that irreparable injury is likely, *see id.* at 12.

As discussed below, all relevant factors favor a preliminary injunction pending expedited discovery and an expedited final hearing on the merits in this case.  A preliminary injunction therefore should be granted.

## ARGUMENT

I. **THE BOARD'S ATTEMPT TO ABANDON THE MAJORITY RULE VIOLATES BOTH THE RLA AND THE APA.**

There is a substantial likelihood that ATA will prevail on the merits of its claims that the Board's minority rule violates the RLA and the APA.  The minority rule is irreconcilable with the plain text of the RLA and, in any event, is an unreasonable construction of that text.  The Board's adoption of the rule is also arbitrary and capricious.  The Board has offered no adequate or neutral justification for abandoning the majority rule; the Board's failure to authorize a parallel decertification process and to add include a "no union" option in run-off elections discriminates against employees who do not favor unionization; the Board has not employed the evidentiary hearing process that its precedents require; and Members Hoglander and Puchala unlawfully predetermined the issues.

A. **The Board's Minority Rule Is Not In Accordance With Law, And Thus Violates The APA, Because The RLA Prohibits The Board From Allowing A Minority Of A Craft Or Class To Select A Representative.**

Under the two-step approach of *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), a court must, at Step One, reject an agency's interpretation when it is inconsistent with the statute's unambiguous text.  And even if the statute is ambiguous, a

court must reject the agency's interpretation at Step Two if it is unreasonable.  *See Landstar Express Am., Inc. v. Fed. Maritime Comm'n*, 569 F.3d 493, 500 (D.C. Cir. 2009); *Am. Library Ass'n v. FCC*, 406 F.3d 689, 705 (D.C. Cir. 2005).  Because the Board's minority rule is both inconsistent with the statute's unambiguous text and unreasonable, there is a substantial likelihood that this Court will vacate it.

### 1.    The Minority Rule Conflicts with the RLA's Plain Text.

a. The RLA provides that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class."  45 U.S.C. § 152, Fourth.  That statutory language does not merely recognize the ability of employees to choose a labor representative, but specifically grants a "right" to make such a choice.  And it does not vest that right in the majority of those who vote in elections.  Instead, it explicitly grants the "right to determine who shall be the representative" to the "majority" of the "craft or class."  The statutory language holds no ambiguity.  Thus, when a "majority" of the "voters" favor unionization, but a "majority" of the "craft or class" does not, Congress has decreed that a labor representative shall not be certified.  It is only when a majority of the employees in the craft or class favors a union that the Board may certify a representative.

In direct conflict with the RLA's plain language, the Board asserts in its final rule that the term "majority" may be read as vesting the right to determine who shall be the representative in the majority of those employees who "vote" even when they constitute a *minority* of the craft or class.  *See* 75 Fed. Reg. at 26,067.  Indeed, under the new minority rule, if only 15% of the craft or class vote, the Board will still certify a union as the representative as long as a majority of that small percentage votes in favor of union representation.  That result is flatly inconsistent with Congress's decision to lodge the right to choose a representative in the "majority" of the "craft or class," rather than in the majority of employees who "vote."

The Board's rule is not only inconsistent with the statute's "majority" of "craft or class" language; it also fails to respect Section 2, Fourth's right-granting language.  In vesting the "right" to determine the class representative in a majority of a craft or class, Section 2, Fourth both empowers the majority to make representation decisions and acts as a legal constraint on the Board's authority under 45 U.S.C. § 152, Ninth, to certify a union.  That is because the term "right" carries a long-accepted meaning of both empowerment and constraint.  *See* John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States* 483 (1856) ("Right is the correlative of duty, for, wherever one man has a right due to him, some other must owe him a duty."); *Ullmann v. United States*, 350 U.S. 422, 427 n.2 (1956) (affirming that "rights and duties are correlative").

As a consequence, the Board is barred from certifying a union unless a "majority" of employees affirmatively exercises its "right" to make that determination.  The Board's new rule fails to observe that limitation on its authority.  Under the minority rule, the Board will certify a union when a majority of the voters favor unionization, even when a majority of the craft or class *has not* exercised its right to make that choice.  In the Board's view, it is free to do so because employees who do not vote may be deemed to acquiesce in the choice of the majority of voters.  *See* 75 Fed. Reg. at 26,073.  Under the text of Section 2, Fourth, however, a statutory "majority" does not consist of employees who vote for unionization plus employees who do not vote.  Instead, the "majority" to which the statute refers consists of the majority of *all* employees in the craft or class.  And Section 2, Fourth expressly precludes the Board from certifying a representative until *that* majority has affirmatively exercised its "right" to "determine" that there shall be a "representative."  45 U.S.C. § 152, Fourth.  Because nonvoters do not affirmatively exercise their right to determine that there shall be a representative, the RLA's text forecloses the

Board's acquiescence approach.  That acquiescence approach impermissibly transfers the statutory right to determine that there shall be a representative from the majority of the craft or class to the majority of voters.

b.  The origin of the Section 2, Fourth right confirms the plain meaning of the statute. Prior to the enactment of Section 2, Fourth, the then-existing Railway Labor Board ("RLB") issued a decision in which it held that "[a] majority of any craft or class of employees shall have the right to determine what organization shall represent members of such craft or class." Decision No. 119, *Int'l Ass'n of Machinists v. Atchison, T. & S.F. Ry.*, 2 Dec. U.S. Railroad Labor Bd. 96, para. 15 (Apr. 14, 1921) (attached to Smith Decl. as Ex. L).  Two years later, the RLB rejected that approach, concluding that rather than a "right" to determine the representative, all employees should instead be given only the "privilege of expressing their choice," and that "a majority of votes properly cast and counted in an election properly held should determine the will and choice of the class."  Decision No. 1971, *Bhd. of Railway & S.S. Clerks v. S. Pac. Lines*, 4 Dec. U.S. Railway Labor Board 625, 629 (Sept. 21, 1923) (attached to Smith Decl. as Ex. M).

When Congress amended the RLA eleven years later, it therefore had two different models before it:  One gave the majority of the craft or class a right to determine a representative; the other gave the craft or class an opportunity to vote, but ultimately lodged the right to choose a representative in the majority of those voting.  Presented with that choice, Congress rejected the RLB's opportunity-to-vote/majority-of-votes-cast standard and instead embraced the "right" of a majority of the craft or class to make the choice.  *See ABNE*, 380 U.S. at 659.[4]  For the next 75 years, the Board acted in accordance with that mandate.[5]

---

[4] The Board asserts that Decision No. 1971's opportunity-to-vote/majority-of-votes cast standard was merely an "interpret[ation]" of the language in Decision No. 119 that Congress later adopted. 75 Fed. Reg. at 26,068.  But the standard articulated in the later decision is facially irreconcilable with the earlier standard.

c.  Contrary to the Board's contention, *Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515 (1937), does not authorize the Board to grant a minority of a craft or class the power to compel unionization.  That decision merely approved of the Board's efforts to safeguard the *majority's* decision to unionize.

In *Virginian Railway*, the Court addressed the question whether the Board had properly certified the Federation union as the representative of a blacksmiths craft.  A *majority* of the craft participated in the election and voted for unionization.  But there were two unions in the election.  And although the Federation obtained a majority of votes cast, the combination of the employees who voted for the competing union and the employees who did not vote prevented either of the unions alone from obtaining the votes of a majority of the craft.  300 U.S. at 559-60.  In that context, the Board treated the non-participating *minority* as having acquiesced in the will of the *majority* that had participated and favored unionization.  *Id.* at 560.  The Supreme Court upheld the Board's determination because, had it held otherwise, a non-participating *minority* of the craft could thwart the *majority's* expressed wishes for unionization.  *Id.*  As the Court explained, if in addition to a majority of a craft or class favoring unionization, the majority must also vote in favor one of two or more competing unions, then "an indifferent minority could prevent the resolution of a contest."  *Id.*

----

[5] The Board errs in relying on a statement in a Senate report that "the choice of representatives of any craft o[r] class shall be determined by a majority of the employees voting on the question.'"  75 Fed. Reg. at 26,068 (quoting S. Rep. No. 73-1065, at 2 (1934)).  Because the text of the RLA unambiguously grants the majority of the craft or class the exclusive right to make representation determinations, and not merely an opportunity to vote, the statute's legislative history is beside the point.  *United States v. Gonzales*, 520 U.S. 1, 6 (1996) ("Given the straightforward statutory command, there is no reason to resort to legislative history.").  In any event, the relevant passage can fairly be read as suggesting only that a majority vote will control, *assuming* the majority of the craft or class has participated in the election and voted in favor of unionization.  A subsequent colloquy between then-Chairman Eastman and Representative Pettengill confirms that understanding.  *See* Hearing Before The House Committee on Interstate and Foreign Commerce, 73d Cong. 34-35 (May 22, 1934) (recognizing that the plain language of the statute requires "a majority of those who have the right to vote and participate in elections").

In reaching that result, the Court nowhere suggested that a union could be certified if it prevailed in an election in which only a *minority* of a craft or class participated and favored unionization.  Indeed, the district court in that case had voided the certification of the Federation as representative of a separate craft of carmen and coach cleaners precisely because only a minority of eligible employees had participated in that election and favored unionization.  *See Sys. Fed'n No. 40 v. Virginian Ry. Co.*, 11 F. Supp. 621, 628 (E.D. Va. 1935).  And the Supreme Court did not call that holding, which had not been appealed, into question.

The Board's new rule falls on the wrong side of the line drawn in *Virginian Railway*. The new rule does not seek to protect the majority's expressed wishes in favor of unionization against obstruction by a nonparticipating minority.  To the contrary, it protects the minority who vote in favor of unionization against "obstruction" by the *majority* of the craft or class.  75 Fed. Reg. at 26,073.  The statute, however, expressly gives the majority of the craft or class the right to determine whether there shall be a representative regardless of the minority vote.  Thus, under the text of Section 2, Fourth, if a craft or class is to choose to be represented by a union, the majority of the craft or class must do the choosing.  *See Virginian Ry. Co.*, 11 F. Supp. at 628 ("[I]n the case of the carmen and car cleaners less than a majority of the eligibles voted, so that as to that craft there was no election.").  The Board's rule is flatly at odds with this requirement.[6]

---

[6] The Board's reliance on *International Brotherhood of Teamsters v. Brotherhood of Railway, Airline & Steamship Clerks*, 402 F.2d 196 (D.C. Cir. 1968), is misplaced.  In that case, the D.C. Circuit observed that the Supreme Court in *Virginian Railway* "upheld the use of a presumption that non-voters concur in the wishes of the majority of voters," but it also recognized that "a majority of the employees in the unit did participate, *and the Court noted that fact*," *id.* at 204 n.16 (emphases added).  The Board also cites *Continental Airlines, Inc. v. NMB*, 793 F. Supp. 330 (D.D.C. 1991), but that case involved a challenge to the NMB's decision to "transfer the certifications from an employee union to its successor after the merger of the two unions," *id.* at 331, and the court merely held that the decision was "not subject to judicial review," *id.* at 334.

d.  The Board's rule also cannot be justified by reference to the National Labor Relations Act ("NLRA").  As the Supreme Court has cautioned, the NLRA "cannot be imported wholesale into the railway labor arena.  Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes."  *Trans World Airlines v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 439 (1989) (citation and internal quotation marks omitted).  With respect to the process for determining a representative, the "differences" between the NLRA and RLA are clear:  the NLRA shares neither the critical language nor the legislative background of the RLA.  The NLRA speaks only of the responsibilities of representatives "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes."  29 U.S.C. § 159(a).  That language does not give a majority of the bargaining unit the "right" to choose a representative—and thus does not impose a correlative legal constraint on how the National Labor Relations Board ("NLRB") may determine the majority's representative.  And nothing in the legislative background of Congress's choice of that language disables the NLRB from choosing the opportunity-to-vote standard that the RLB applied before Congress rejected it for the NMB.[7]

Other differences between the NLRB's practice and the Board's make any comparison inapt.  For example, the NLRB's practice is to examine carefully whether the results of a minority election are meaningfully representative of the preference of the employee group as a whole, and this administrative determination is ultimately subject to judicial review under the

---

[7] The Board points to a statement in the House Report on the NLRA's Section 9(a) that it is "'merely an amplification and further clarification of the principles enacted into law by the Railway Labor Act and by section 7(a) of the National Industrial Recovery Act [NIRA], with the addition of enforcement machinery of familiar pattern.'"  75 Fed. Reg. at 26,069.  But that House Report was referring only to the similar manner in which the NIRA, the NLRA, and the RLA all protect employees' basic right to "organize and bargain collectively," NIRA, ch. 90, tit. I, § 7(a), 48 Stat. 195, 198 (June 16, 1933).  That statement, in any event, could not override the differences in language between the NLRA and the RLA.

APA.  *See Lemco Constr., Inc. & Int'l Bhd. of Elec. Workers*, 283 N.L.R.B. 459, 459 (Apr. 14,

1987) (explaining that the Board will consider an election to be representative and valid only if a

substantial number of employees voted).  By contrast, the Board's rule does not incorporate any

post-election scrutiny to determine whether the results of a minority election are representative

of the wishes of a majority of the craft or class.  Instead, the Board proposes to consider only

whether there has been unlawful interference with voting.  *See* 75 Fed. Reg. at 26,075 n.22.  And

that determination would not be subject to ordinary APA review.  *See US Airways*, 177 F.3d at

989.  In addition, the NLRB allows a minority of 30% of the eligible voters to initiate a

decertification election to return to non-union status.  NLRB Rules and Regulations and

Statements of Procedure § 101.18 (2002) ("NLRB Rules").  Under the Board's showing-of-

interest rule, by contrast, the Board will not require a union to stand for re-election unless a

majority of eligible voters submits individually signed authorization cards on behalf of an

alternative representative, and it will not authorize a straightforward decertification election at all.

29 C.F.R. § 1206.2(a); *see infra* Part I.B.2-3.  Accordingly, the NLRB's adoption of a majority-

of-votes-cast rule provides no support for the Board's rule.  And for the same reasons, decisions

upholding the NLRB's rule, *see NLRB v. Standard Lime & Stone Co.*, 149 F.2d 435 (4th Cir.

1945), are inapposite.

     e.  Nor does the Board's rule find support in the political election laws that allow a

winner to be determined based on a plurality or majority of votes cast rather than a majority of

eligible voters.  *See* 75 Fed. Reg. at 26,069 (analogizing RLA elections to political elections).

Those laws typically expressly permit elections to be determined based on the votes cast.[8]  That

---

[8] *See, e.g.*, Cal. Elec. Code § 15452 (2009) ("The person who receives a plurality of the votes cast for any office is elected or nominated to that office in any election"); Fla. Const. art. VI, § 1 ("General elections shall be determined by a plurality of votes cast."); Ga. Code Ann. § 21-2-501 (2009) (providing general rule that "no candidate shall be … elected to public office in any election or special election

difference in language reflects the differences between political elections and RLA elections. Political elections presume that there will be representation, while, by contrast, the very premise of the RLA is that the system will function effectively with or without union representation. *See ABNE*, 380 U.S. at 669-70 & n.5 (explaining that the RLA protects the majority's "option of rejecting collective representation"); *Teamsters v. Bhd. of Ry. Airline & Steamship Clerks ("BRAC")*, 402 F.2d 196, 202-03 (D.C. Cir. 1968) (same). Moreover, in political elections, the electorate has a regular opportunity to vote its representative out of office using the identical process as was used to vote in the incumbent. In contrast, under the Board's rule, a union with minority support need not stand for re-election unless a majority of eligible voters initiates a request for an election between the incumbent union and another proposed representative. Thus, unlike an elected official, an RLA union that prevails in a representation election is certified for an indefinite period and may never have to stand for re-election. *See* 75 Fed. Reg. at 26,085 (Chairman Dougherty, dissenting) ("[O]nce they have been elected, Board procedures make it extremely difficult for unions to be removed.").[9]

---

unless such candidate shall have received a majority of the votes cast to fill such . . . public office"); S.D. Const. art. 26, § 9 ("Said board of county canvassers shall issue certificates of election to the persons who shall have received the highest number of votes cast ...."); Tenn. Const. art. III, § 2 ("The person having the highest number of votes shall be Governor ...."); Tex. Elec. Code Ann. § 2.001 (2009) (providing general rule that "to be elected to a public office, a candidate must receive more votes than any other candidate for the office").

[9] For the same reasons, certain cases interpreting political election laws to permit elections to be determined based on the votes cast are inapposite here. Those cases have involved laws that referred to "voters." *See, e.g., Carroll County v. Smith*, 111 U.S. 556, 565 (1884) (state provision calling for two-thirds majority of "qualified *voters*" requires only a two-thirds majority of those who cast a vote, because "a voter is one who votes, not one who, although qualified to vote, does not vote" (emphasis added)); *St. Joseph Twp. v. Rogers*, 83 U.S. 644, 664 (1873) (holding that a state statute that required a majority of "legal *voters* of the township" could be construed as referring to "a majority of the legal voters of the township voting at the election" (emphasis added)); *Montgomery County Fiscal Court v. Trimble*, 47 S.W. 773, 773-74 (Ky. 1898) (holding that a state constitutional provision, which prevented a county from becoming indebted "without the assent of two-thirds of the *voters* ... voting at an election to be held for that purpose," meant to cover only those voters who participated; but acknowledging that if the provision "had said the county could not incur an indebtedness 'without the assent of two-thirds of the *electors*

f.  Finally, the Board states that it is bound by the Attorney General's 1947 opinion that it has the authority to adopt a minority rule.  *See* 75 Fed. Reg. at 26,068, 26,070.  Regardless of whether the Board properly treated that opinion as binding on it, in conducting a *Chevron* Step One analysis, this Court is not bound—and owes no deference to—the Attorney General.  *Chevron*, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  And, for all of the foregoing reasons, the Attorney General's opinion is erroneous and should not be followed.

*  *  *

In sum, the NMB's minority rule is irreconcilable with Section 2, Fourth's plain text and its historical context.  There is a substantial likelihood that the Board's rule will be vacated at *Chevron*'s first step.

## 2.    The Minority Rule Is an Unreasonable Construction of the RLA.

Even if Congress did not unambiguously foreclose the Board's minority rule, that rule is not a reasonable construction of Section 2, Fourth.  In particular, it is unreasonable to interpret Section 2, Fourth to give a minority of the craft or class the right to choose a union representative when (i) its text gives a "right" to choose to the "majority" of the "craft or class," (ii) the legislative background shows that Congress rejected the majority of voters standard, and (iii) neither *Virginian Railway*, the NLRA, nor political elections provide support for the Board's rule.  Thus, even if the Board's minority rule were not contrary to the plain text of the RLA, it is an unreasonable construction of the RLA and therefore is substantially likely to be vacated at *Chevron* Step Two.  *See Landstar Express*, 569 F.3d at 500.

---

thereof,' we would understand that an elector's failure to vote was equivalent to voting against the proposition" (emphases added)).

**B.      The Board's Rule Change Is Arbitrary And Capricious.**

The Board's rule change is not only irreconcilable with the text of the RLA, but it is also

"arbitrary" and "capricious" under the APA.  5 U.S.C. § 706(2)(A), (E).  The Board's final rule

violates the APA's "scheme of reasoned decisionmaking" for several reasons.  *See Allentown*

*Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998) (internal quotation marks omitted).  First,

the Board failed to identify any change in circumstances that justifies its dramatic departure from

the majority rule the Board has successfully employed for 75 years and has refused to abandon

on at least four prior occasions.  Second, having rejected the majority rule, the Board's failure to

adopt corresponding changes in the decertification process and the run-off election process

discriminates against employees who do not want a union representative.  Third, the process the

Board's majority used to propose and then to promulgate the new rule was fatally deficient under

the Board's precedent and the APA.  Finally, the Board's majority impermissibly predetermined

the issues.

**1.      The Board Has Offered No Neutral and Rational Basis, Much Less**
**the Compelling Reasons Required by Its Precedent, For Abandoning**
**the Majority Rule.**

The Board has offered no adequate and legitimate justification for abandoning its

majority rule.  Accordingly, there is a substantial likelihood that this Court will hold the Board's

rulemaking to be arbitrary and capricious.

a.  The APA precludes agencies from abandoning prior policies on a whim.  As Justice

Kennedy recently explained in his controlling concurring opinion in *FCC v. Fox TV Stations*, an

agency must cogently and rationally explain why it is changing or revoking a policy:  "The

question in each case is whether the agency's reasons for the change, when viewed in light of the

data available to it, and when informed by the experience and expertise of the agency, suffice to

demonstrate that the new policy rests upon principles that are rational, neutral, and in accord

with the agency's proper understanding of its authority."  129 S. Ct. 1800, 1823 (2009)

(Kennedy, J., concurring in part and concurring in the judgment).  Moreover, an agency "cannot

simply disregard contrary or inconvenient factual determinations that it made in the past."  *Id.* at

1823-24.  When an agency makes a "180 degree turn away" from a prior policy the agency "has

not persuasively distinguished," its action is "quintessentially arbitrary and capricious" and must

be set aside.  *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999).

      b.  The Board has not provided a logical and neutral reason for abandoning the majority

rule.  For 75 years, the Board has held the "firm conviction that its duty under Section 2, Ninth

[to investigate representation disputes] 'can be more readily fulfilled and stable relations

maintained by a requirement that a majority of eligible employees cast valid ballots.'"  *See*

*Chamber of Commerce*, 14 N.M.B. at 362-63.  Thus, the majority rule has been based on two

premises.  First, the Board had adhered to the view that, in the airline and rail industries, the

majority rule is the most accurate measure of a majority's intent.  Second, the Board had

determined that the majority rule promotes labor stability, which is one of the overriding

purposes of the RLA, *see* 45 U.S.C. § 151a(1) (purposes of RLA include "avoid[ing] any

interruption to commerce or to the operation of any carrier engaged therein").  Given these

determinations, the Board had denied several prior requests to abandon the majority rule.  *See*

*Chamber of Commerce*, 14 N.M.B. at 362-63; *Delta Air Lines*, 35 N.M.B. at 131-32; *see also*

*Pan Am. Airways*, 1 N.M.B. 454, 455 (1948).  Thus, in order to abandon the majority rule in a

rational and neutral manner, the Board would have needed to identify evidence that these

premises—*i.e.*, that the majority rule is the most accurate measure of employee intent and that

the majority rule is essential to promoting labor stability—are no longer true or that there is some

other change in circumstance that is sufficient to support its new rule.  The Board has failed to make such a showing.

*Accuracy.*  According to the Board, its principal rationale for its rule change is that its new rule is a more accurate measure of majority intent.  In particular, the Board faults the majority rule for counting nonvoters as not favoring unionization.  75 Fed. Reg. at 26,073/2.  The Board has failed to offer a reasoned basis for that criticism.  Since 1965, the instructions to employees have made it clear that "no vote is a vote for no representation."  *ABNE*, 380 U.S. at 670.  Countless elections have been held throughout the airline and rail industries using these instructions.  The Board offers no evidence that nonvoters have suddenly begun to misunderstand those clear directions.

The results of the elections also leave no doubt that the majority rule has allowed employees to vote for unionization, when they have wanted to do so.  As the Board concedes, "unions enjoy greater success under NMB elections than under the voting procedure used by the NLRB.  Since 1935, unions have achieved certification in 68 percent of NMB elections but in only 58 percent of NLRB-sponsored elections. . . . [And] in 2009, certification was the outcome of 73 percent of NMB elections."  75 Fed. Reg. at 26,075/1-76/2.

The Board speculates that there are many reasons that persons might not vote besides disfavoring unionization, including "travel, illness, [] apathy," or religious objections.  *Id.* at 26,073.  But the Board offers no evidence that there has been any relevant change in circumstances with respect to these factors, much less that these reasons for not voting make a *minority* rule a more accurate barometer of the *majority's* intent than a *majority* rule.  And in fact, they do not.

- 21 -

The Board's supposedly more accurate new rule treats these nonvoters as having acquiesced in the decision of the voting majority.  But that assumption makes no sense with respect to employees who do not vote because of travel, illness, or religious objections.  Putting the disinterested to one side, this group consists of employees who have a preference for one side or the other, but are effectively prevented from expressing that preference; they are not employees whose inaction reflects acquiescence.  The Board's treatment of this group as acquiescing in the decision of the voting majority is utterly irrational.  As for employees who do not vote because of disinterest, they are "appropriately measured as *not* affirmatively desiring a change in the status quo," just as the majority rule does.  *Id.* at 26,084.  (Chairman Dougherty, dissenting).  To the extent that the Board now wishes to treat this group as favoring a change in the status quo, it offers no plausible support for that treatment.

Indeed, for 75 years, the Board has concluded that nonvoters are appropriately treated as not favoring a change in the status quo.  And the Board reiterated that conclusion only two years ago.  *See Delta Air Lines*, 35 N.M.B. at 131-32.  The only thing that has changed since then is the political composition of the Board, and the prospect of two elections involving large numbers of employees at Delta in which a change to a minority rule would increase the chances of unionization.  Of course, those circumstances alone could not provide a neutral basis for the Board to change its election rules.  Yet, as Chairman Dougherty has explained, the Board's decision appears to rest on precisely those circumstances.  75 Fed. Reg. at 26,085/2.  Such a rationale is incompatible with the APA's requirement of logical and neutral decisionmaking.

*Stability*.  The Board's treatment of the stability rationale underlying the majority rule is equally arbitrary and capricious.  The Board asserts that stability was never a basis for the majority rule, but its revisionist history is incorrect.  *See Nat'l Fed'n of Fed. Employees v. FLRA*,

412 F.3d 119, 123 (D.C. Cir. 2005) (rejecting agency's "revisionist" view of its precedents).

Stability was part of the basis for the majority rule from the very outset.  *See Railway Clerk*, *in Official Journal of Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees* at 473 (Dec. 1935) (then-Chairman James W. Carmalt) ("Our Board has felt that it was good administration at least to read the Act strictly in accordance with its terms" because the majority rule "prevents slipshod organization work and leads to stability."), *quoted in* Brief of Petr. at 58 n.*, *Virginian Ry.*, 300 U.S. 515 (No. 324), 1937 WL 40466.  In any event, by 1948, the Board's accumulated experience had convinced it to *retain* the majority rule to promote stability.  *Pan Am*, 1 N.M.B. at 455.  And the Board reaffirmed the stability rationale in 1987, *Chamber of Commerce*, 14 N.M.B. at 362, and in 2008, *Delta*, 35 N.M.B. at 131.

Now, the Board asserts that stability is related to the Board's mediation function, not to its representation function.  75 Fed. Reg. at 26,076/1-2.  Under the RLA, however, the Board must strive to promote stable relations in both its mediation and representation capacities.  *See, e.g.*, 45 U.S.C. § 151a (noting the RLA's "general purpose[]" of "avoid[ing] any interruption to commerce or to the operation of any carrier engaged therein").

The Board also asserts that, in any event, it need not consider stability here because the majority rule does not promote stable relations.  But given that the Board has viewed the majority rule as promoting stability for 75 years, it would take something more than a new Board's unsupported say-so to justify a different conclusion.  That is particularly true because the Board's longstanding conclusion that the majority rule promotes stability is based on accumulated experience and common sense.  As explained by the Board in *Chamber of Commerce*, 14 N.M.B. at 362, the majority rule promotes collective bargaining agreements and reduces the risk of strikes because "[a] union without majority support cannot be as effective in

negotiations as a union selected by a process which assures that a majority of employees desire representation."  *See also Railway Clerk*, *in Official Journal of Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees* at 473 (then-Chairman James W. Carmalt) ("The organization that obtains the contract by reason of a minority of the votes in a class will generally have rough sledding in the administration of the contract for the employees."), *quoted in* Brief of Petr. at 58 n.*, *Virginian Ry.*, 300 U.S. 515 (No. 324), 1937 WL 40466.  Allowing certifications of unions that lack the support of a majority of a craft or class poses a unique threat in the RLA context.  In the airline industry under the RLA, unlike in other industries governed by the NLRA, labor unions are certified and bargain on a company-wide basis, rather than on a local or plant basis.  As a result, if a union does not have majority support, then it is likely that the stability of labor relations on a company-wide or even national scale will be adversely affected.  Such a lack of stability will adversely affect the RLA's purpose of avoiding "any interruption to commerce or to the operation of any carrier engaged therein."  45 U.S.C. § 151a.

The Board says its conclusion in *Chamber of Commerce* "overlooks the fact that carriers are required by law to treat with Board-certified representatives."  75 Fed. Reg. at 26,077/2.  But that simply fails to answer the finding in *Chamber of Commerce* supported by 75 years of experience that, as a practical matter, the manner in which a carrier fulfills its duty is necessarily affected by the support that the union has.  Moreover, a weak union creates a particularly serious risk of unauthorized labor disruptions, a danger that the Board completely fails to address.  *Id.* at 26,086/3 (Chairman Dougherty, dissenting).

To defend its newfound conclusion, the Board points to the experience in the wake of elections under *Laker* and *Key* ballots, where unions have been certified based on a majority of

votes cast as a remedy for gross carrier election interference.  *See Laker Airways*, 8 N.M.B. 236

(1981); *Key Airline*, 13 N.M.B. 153 (1986).  But the lack of strikes following those elections

says nothing about whether the majority rule promotes stability.  When a carrier has interfered in

an election—and thus has prevented members of the majority from casting ballots in favor of

unionization—the majority of votes cast may in that circumstance be more likely to accurately

reflect majority support for representation.

It is also striking that, while the Board rejects 75 years of experience about the link

between the majority rule and stability, it is "happy to acknowledge the stabilizing role of

representation procedures" when it is convenient to do so.  For example, it relies on the

importance of stability in maintaining its rule requiring a "showing of interest" of a *majority* of

eligible employees in order to obtain an election to challenge an incumbent union, a rule that

favors incumbent unions by making it more difficult to unseat them.  75 Fed. Reg. at 26,086/2

(Chairman Dougherty, dissenting); *see also supra* at 16 (describing showing-of-interest rule).

When a Board rejects stability when it stands in the way of a change that favors unionization,

and then invokes stability when it supports retaining a rule that favors unionization, it is clear

that neutral principles have been cast aside.

*Other Changes*.  The Board briefly alludes to some other supposed changes in

circumstances.  But these are make-weight, at best.  For example, the Board says it adopted the

majority rule to combat company unions, and that company unions are no longer a problem.  75

Fed. Reg. at 26,074/1.  The Board, however, offers no evidence that a problem with company

unions caused the Board to adopt the majority rule.  In any event, the Board's decision to retain

the rule for the last 50 years could not have been based on company unions because they

disappeared over 50 years ago.  S. Rep. No. 81-2262, at 2 (1950).

In addition, the Board asserts it adopted the majority rule to offset the risk that an informed minority with better access to communications technology would overwhelm an uninformed minority, and that this risk no longer exists. *See* 75 Fed. Reg. at 26,074/3. But there is no evidence that the majority rule ever had anything to do with this supposed risk. Moreover, far from undermining the majority rule, expansion of communications technology provides added support for the majority rule because it makes it easier for employees to express whether they want to change the status quo.

\* \* \*

In sum, the Board fails to offer any neutral or legitimate reason that would support the rejection of the 75 year old majority rule. Instead, its analysis leads to the inference that only a change in political composition and the desire to promote the cause of unionization underlies the change. As a result, the Board's abrupt rejection of that rule must be set aside. *See Fox TV*, 129 S. Ct. at 1823-24 (Kennedy, J., concurring in part and concurring in the judgment); *La. Pub. Serv. Comm'n*, 184 F.3d at 897; *accord Ramaprakash v. FAA*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003) (Roberts, J.).

c.   Indeed, under the Board's established precedent, the Board must not only identify a reasoned basis for this significant election-rule change; it must offer "compelling reasons" for the change. *Chamber of Commerce*, 14 N.M.B. at 362. In particular, it must show that the change is either "mandated by the [RLA] or essential to the Board's administration of representation matters." *Id.* at 360, 362. That standard for making rule changes applies to all the Board's significant rulemaking decisions. As the Board has stated, "the Board has a long-standing policy of amending its rules only when required by statute or essential to the administration of the Act." *Id.* at 356-57. In 2008, the Board unanimously reaffirmed this

standard in denying a request to abandon the majority rule.  *See Delta Air Lines*, 35 N.M.B. at

131-32.  The Board was not required to adopt that rigorous standard for rule changes.  But once

it did, it was bound to apply it.  The APA's requirement of a "logical and rational"

decisionmaking process directs an agency to apply the decisionmaking rules it has previously

announced.  *Allentown Mack*, 522 U.S. at 374.

       The Board purports to find that the change to the minority rule is somehow "essential,"

75 Fed. Reg. at 26,075/3, but it does not explain why.  And given the Board's 75 years of success

under the majority rule, the claim that the adoption of a minority rule is "essential" to the

Board's administration of representation matters is implausible on its face.  Indeed, the Board

found that it was not essential in its 2008 decision in *Delta Air Lines*, 35 N.M.B. at 132.  And

nothing has happened since then to lead to a different conclusion now.  Thus, even assuming that

the Board could satisfy the general APA standard for making a rule change, it has not satisfied its

own standard for such a change.

       Perhaps recognizing that deficiency, the Board suggests that it is not bound by its rule

change standard.  75 Fed. Reg. at 26,075/3.  But the Board cannot abandon its "compelling

reasons" standard merely because it finds that standard inconvenient.  An agency may abandon a

decisionmaking rule only if it supplies an adequate explanation for doing so.  *See INS v. Yang*,

519 U.S. 26, 32 (1996); *Nat'l Treasury Employees Union v. FLRA ("NTEU")*, 550 F.3d 1148,

1155 (D.C. Cir. 2008).  Here, the Board has not offered any reasoned explanation for abandoning

its longstanding 'compelling reasons" standard, much less offered an explanation for rejecting

that standard for this one change, while retaining it for all future changes.

       Thus, the Board has neither coherently applied its "compelling reasons" standard nor

offered a reasoned explanation for abandoning it.  That failure "constitutes an inexcusable

departure from the essential requirement of reasoned decision making."  *CBS v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971).

> **2.      The Board's Refusal to Adopt a Parallel Decertification Procedure Is Arbitrary and Capricious.**

The Board also acted arbitrarily and capriciously in refusing a request to establish a coherent and neutral decertification process that effectuates an equal right for employees to choose non-union status.  The Board currently lacks a "formal decertification rule[]."  *Chamber of Commerce*, 14 N.M.B. at 358.  Instead, the Board has a convoluted substitute process under which a majority of all employees in a craft or class must sign individual authorization cards that each name the same individual to run against the incumbent union in an election with the "understanding" (not legally binding) that the challenger (known as a "straw man") will disclaim collective representation if he is successful.  *See generally* 29 C.F.R. § 1206.2(a).

In response to the Board's notice that it intended to change the majority rule, parties submitted requests that the Board also simultaneously (i) adopt a parallel, true decertification process instead of its current "straw-man" process, and (ii) adopt the same showing-of-interest requirement for returning to non-union status as for obtaining union representation.  The Board refused to make those changes, and its failure to do so was discriminatory, arbitrary, and capricious.

a.  First, the combination of the Board's adoption of the majority rule and its refusal to modify the showing-of-interest requirement for returning to non-union status improperly discriminates in favor of unionization.  Prior to the Board's rule change, the participation of a majority of eligible employees was needed *both* for unionization *and* to seek to return to non-union status under the (theoretical) straw-man process.  The majority rule required a majority of eligible employees to vote for unionization before a union could be certified.  And the Board's

showing-of-interest rule similarly required the participation of a majority of eligible employees to initiate the straw-man process that, at least theoretically if not in practice, could result in removing union representation.

With its newly adopted rule, the Board has now eliminated any semblance of equality between the two processes.  The minority rule, when combined with the Board's showing-of-interest rule, provides that 35% of the craft or class can initiate a union election if there is currently no representative, and a mere *minority* of the craft of class can elect a representative.  *See generally* 29 C.F.R. § 1206.2(b).  But a *majority* of employees is still required to initiate a straw-man process to seek to eliminate union representation, and can only do so through a majority's showing of interest.  The Board's decision to "maintain [these] two irreconcilable policies" is not only "arbitrary and capricious agency action," *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 935 (D.C. Cir. 2008); it also violates Section 2, Fourth, which requires the Board to respect equally both the right to select a representative and the right to "reject[] collective representation."  *ABNE*, 380 U.S. at 669 n.5; *Russell v. NMB*, 714 F.2d 1332, 1343 (5th Cir. 1983); *BRAC*, 402 F.2d at 202-03.

The Board's only explanation for not changing its showing-of-interest rule is that the rule protects labor stability by discouraging union raiding.  75 Fed. Reg. at 26,079/1.  Rather than providing a neutral basis for its decision, however, that explanation only highlights the Board's inconsistency and its discrimination in favor of unionization.  As discussed above, in discarding the majority rule, the Board rejected stability as a basis for its election rules.  But in maintaining its showing-of-interest rule, the Board embraces stability as a reason for its election rules.  The Board thus relies on stability to support its elections rules only when it favors unionization.  In any event, an interest in stability cannot justify election rules that favor the right to select a

representative over the right to reject union representation.  The RLA flatly prohibits such discrimination.  *ABNE*, 389 U.S. at 669 n.5.

A comparison to NLRB practice further underscores the Board's inconsistency and discrimination in favor of unionization.  In the NLRB's practice, 30% of the employees can call for a direct decertification election (*i.e.*, "yes/no") by filing a petition, NLRB Rules, *supra*, § 101.18, a far lower percentage than the majority required by the Board merely to initiate the theoretical straw-man process.  While the Board now eagerly adopts the NLRB's minority rule, it emphatically rejects the NLRB's parallel 30% decertification election threshold.  The Board, of course, is not required to follow NLRB practice in every particular.  But the Board cannot follow NLRB practice when it furthers unionization, and reject NLRB practice when it does not.  That approach is manifestly unprincipled and impermissibly discriminates against employees who do not favor a union.

b.  The Board's refusal to authorize a direct, parallel decertification process to replace its convoluted straw-man process also is arbitrary and capricious.  As Chairman Dougherty explained, that process is the "most confusing and obfuscatory practice in all of the Board's representation procedures."  75 Fed. Reg. at 26,086/3-87/1.  There is no apparent reason to refuse to modify it other than to make it more difficult for employees to decertify than to certify a union.  Indeed, under this "confusing and obfuscatory practice," it has proven to be virtually impossible for a large company-wide craft or class of employees to decertify a union and return to non-union status.

The Board's failure to authorize a parallel decertification process in light of its change to a minority rule is particularly striking given that the Board's purported justification for discarding the majority rule is to measure voter choice more accurately.  A consistent application

of that interest would surely lead the Board to authorize a true decertification process.  There can

be no serious question that a straightforward decertification process will more accurately

measure voter choice than the current convoluted straw-man process.  But "[a]pparently,

employee choice only matters to the Majority when it relates to changing the status quo from no

representation to representation and not the other way around."  *Id.* at 26,087/2 (Chairman

Dougherty, dissenting).

 Not only did the Board fail to reform the decertification process; its rule change makes

the straw-man process more confusing than it already was, discriminating against employees

who disfavor unions still further.  *See id.* at 26,078/3-79/1.  Under Board's the final rule, a ballot

under the straw-man process will include a union box, a straw-man box, and a "no union" box.

The predictable result is that some employees who want to decertify the incumbent union will

vote "no union," while others, remembering they cast an authorization card for the straw man,

will vote for the straw man.  Yet "the union will be decertified only if *one* of these options

receives a majority of the votes cast—an outcome made less likely by the Majority's new rule."

*Id.* at 26,087/1 (Chairman Dougherty, dissenting).  It is difficult to see any reason for such a state

of affairs other than a desire to stack the deck against decertification.

  **3.**  **The Board's Refusal to Allow a "No Union" Option During Run-Off Elections Arbitrarily Discriminates in Favor of Unionization.**

 The Board's rule change lacks a second feature that would neutrally ensure employees'

free choice: a "no union" option during run-off elections.  Under the new rule, a ballot in an

initial election between two unions will allow the employees to vote for the first union, the

second union, or for "no union."  If none of the three options receives a majority of votes cast,

then the Board will hold a run-off election in which the employees' choice almost always will be

to vote for one of the two unions.  75 Fed. Reg. at 26,082/1.  That is true even if more employees

voted for the "no union" option than for either union.  This feature of the Board's rule unlawfully discriminates against employees' right to reject a union.

According to the Board, it does not need to allow a "no union" vote during such a run-off election because it would be reasonable to assume, based upon the initial election, that the majority of the craft or class favors some representation.  *Id.*  The Board offers no support for that across-the-board assumption, and it surely is not universally true.  There are undoubtedly employees who would prefer no union to a union that they disfavor.  Having explained its rule change as necessary to eliminate assumptions regarding voter intent, the Board cannot reasonably justify its refusal to change its run-off procedure based upon an assumption regarding voter intent.

Moreover, the Board's rationale cannot be squared with its purported reason for adding a "no union" option to the initial election.  Providing a "no union" option, the Board asserts, offers "a more accurate measure of employee sentiment" by "providing a clear method of registering" opposition to representation.  *Id.* at 26,073/1.  If the Board is correct, the most accurate measure of employee sentiment during a run-off election would be to offer a "no union" option.  That is what the NLRB does, and that is what the Board would have done had it acted consistently with its rationale for promulgating its new rule.  As Chairman Dougherty explained, "[i]t is impossible to see how [the Board's new regime] serves the Majority's stated goal of better measuring employee intent."  *Id.* at 26,088/1.  The Board's on again, off again concern for accurately measuring voter intent violates the APA.  *See Venetian Casino*, 530 F.3d at 935.

### 4.    The Board Abandoned its Majority Rule Without the Evidentiary Hearing Required by its Precedent.

Furthermore, it was arbitrary and capricious for the Board to abandon the majority rule without providing the evidentiary hearing required by its precedent.  When an agency announces

it will employ a particular decisionmaking process, it must employ that process or offer a logical and neutral reason why it has not done so.  *See NTEU*, 550 F.3d at 1155; *Gardner v. FCC*, 530 F.2d 1086, 1090 (D.C. Cir. 1976); *cf. Fox TV*, 129 S. Ct. at 1823 (Kennedy, J., concurring in part and concurring in the judgment).  The Board did neither.  Because its failure to follow its own precedent prejudiced the ATA's ability to test the factual and policy claims of proponents of the minority rule, the Board's decision must be set aside.  *See* 5 U.S.C. § 706; *Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002).

The Board's failure to use a rigorous evidentiary-hearing process before abandoning its 75-year-old majority was inconsistent with its past practice.  The Board issued its NPRM following a request from TTD.  By contrast, when in 1985 the Teamsters made a nearly identical request for abandonment of the majority rule, the Board instructed that there should be "a full, evidentiary hearing with witnesses subject to cross-examination as the most appropriate method of gathering the information and evidence it will need" to decide whether even to propose amending its election rules.  *In re Chamber of Commerce of the U.S.*, 13 N.M.B. 90, 94 (1986).  As the Board then recognized, such a procedure was the appropriate approach before considering the Teamsters' invitation to overturn voting rules that had been in place since the 1930s, and which had become part of the fabric of the RLA as well as the Board's published regulations.  After that process, the Board declined the Teamsters' invitation.

The Board has since held it would not abandon the majority rule without engaging in an evidentiary hearing procedure like the one used in *Chamber of Commerce*.  In unanimously rejecting a request from the AFA to change the voting rules just two years ago, the Board reasoned:  "AFA has failed to provide sufficient justification for changing the decision in *Chamber of Commerce* above, and, in any event, the Board would not make such a fundamental

change without utilizing a process similar to the one employed in *Chamber of Commerce*, above." *Delta Air Lines*, 35 N.M.B. at 132.

Consistent with Board precedent, the ATA requested that the Board follow the process required by *Chamber of Commerce* and *Delta Air Lines*. ATA Sept. 10, 2009 Letter, *supra*, at 3-5. The Board nevertheless did not hold the evidentiary hearing required by *Chamber of Commerce*. The Board's notice of proposed rulemaking allowed only 60 days for written comment. *See* 74 Fed. Reg. at 56,750/1. The Board did not allow for any evidentiary hearing. The Board did hold a one-day "meeting" on December 7, 2009. But participants were required to submit written transcripts of their statements well in advance of the meeting; there was no opportunity for rebuttal; and there was no taking of testimony under oath and no cross-examination of witnesses.

The failure to follow *Chamber of Commerce* procedures caused clear prejudice. Several persons spoke to alleged facts of potential relevance to whether the Board should upend its 75-year-old rule. *See, e.g.*, NMB, Proposed Changes to Representation Election Procedures: Tr. of Proceedings 53 (Mr. Roach) (Dec. 7, 2009); *id.* at 100-02 (Mr. Parker); *id.* at 136-37 (Ms. Rook); *id.* at 166, 173-74 (Mr. Murphy) (attached to Smith Decl. as Ex. C). And the Board relied upon these untested factual assertions both in adopting its accuracy rationale and in discounting the majority rule's link to stability. *See, e.g.*, 75 Fed. Reg. at 26,063/2; *id.* at 26,073-74; *id.* at 26,076-77. ATA and other commentators would have tested those crucial factual assertions by submitting them to cross-examination if the Board had held the evidentiary hearing required by *Chamber of Commerce*.

The Board asserts that it does not have to justify its departure from the *Chamber of Commerce* procedures because it "has in no way bound itself" to follow them. *Id*. at 26,064/2.

But as discussed above, *Delta Air Lines* expressly bound the Board to use such procedures in any future rulemaking.  By ignoring that holding, the Board acted arbitrarily and capriciously.  *See Fox TV*, 129 S. Ct. at 1823 (Kennedy, J., concurring in part and concurring in the judgment).

### 5.   The Board's Majority Has Predetermined The Issues.

Various publicly available facts give rise to the clear inference that Members Hoglander and Puchala predetermined the issues raised by the NPRM.  These facts establish additional reasons why this Court is substantially likely to vacate the Board's minority rule as arbitrary, capricious, and not otherwise in accordance with law.  Decisionmakers who have predetermined issues necessarily fail to exercise the "logical and rational" decisionmaking required by the APA. *Allentown Mack*, 522 U.S. at 374.  Indeed, decisionmakers violate the Due Process Clause when they act with an "unalterably closed mind" and are "unwilling or unable to consider rationally argument that [the proposed rule] is unnecessary."  *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170, 1174 (D.C. Cir. 1979).  And because Congress charged the Board to maintain a posture of strict neutrality vis-à-vis carriers and labor organizations, *see, e.g.*, *US Airways*, 177 F.3d at 989 n.2, the duty to avoid prejudgment applies with special force to the Board's members, *cf. Cinderella Career & Finishing Schs. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970).[10]  By predetermining the issues, the Board's majority not only failed to exercise their discretion logically and rationally as required by the APA, but also deprived interested parties of due process.

The facts giving rise to the inference that Members Hoglander and Puchala did not have an open mind and predetermined the issues include the following.  First, they published the NPRM by means of an internal process that inappropriately excluded Chairman Dougherty.  *See*

---

[10] ATA made this argument in its Motion for Disqualification, *supra*, at 2-3, and the Board failed to address it.

Dougherty Nov. 3, 2009 Letter, *supra*, at 1-2.  The facts set forth in Chairman Dougherty's letter describe actions showing that the Board's majority was unwilling to consider views and arguments inconsistent with their own and had reached an irreversible decision to adopt the proposed rule.  Specifically, on October 28, 2009 the Board's majority surprised Chairman Dougherty with a draft proposed rule and told her she had one and a half hours to consider it and could not publish a dissent, even though the NMB's policies do not prohibit dissents.  *Id.* at 2; *see also* 75 Fed. Reg. at 26,083/1 (Chairman Dougherty, dissenting).  When Chairman Dougherty protested, the Board's majority only partially relented, allowing her a brief additional period in which to review the rule, but continuing to bar her from publishing a dissent.  *See* Dougherty Nov. 2, 2009 Letter, *supra*, at 2.  When the Chairman insisted on publishing her dissent, she was allowed to do so, but only if she deleted any references to the Board majority's extraordinary behavior.  *Id.*  The Board's majority gave the Chairman no explanation for its rush to publish the proposed rule or its extraordinary treatment of her.  Chairman Dougherty could only conclude that Members Hoglander and Puchala were in a rush to publish the rule and had no interest in her input because they had predetermined the issue.  *Id.*

In addressing this issue in the final rule, the Board majority does not take issue with Chairman Dougherty's account of the facts.  Nor does the majority seek to rebut the inferences that Chairman Dougherty drew from those facts by offering some other explanation for their behavior.  Instead, the Board's majority asserts, without any supporting authority, that the events Chairman Dougherty describes were "an internal agency matter and outside the scope of the rulemaking proceedings."  75 Fed. Reg. at 26,065/2.  To the extent that Board Members Hoglander and Puchala are suggesting that the events described in Chairman Dougherty's letter are not relevant in deciding whether they approached rulemaking with an unalterably closed

mind, such a suggestion is clearly incorrect.  The Board majority's rush to judgment and its

remarkable exclusion of the Chairman from the process is powerful evidence of predetermination.

*See, e.g.*, *Ass'n of Nat'l Advertisers*, 627 F.2d at 1170 (considering publicly available facts

outside rulemaking record).  And the evidence is particularly probative given the Board

majority's failure to offer any contrary explanation for their behavior.

Second, the timing of the proposed rule change has an unmistakable relationship with the

on-going organizing campaign at Delta that not only reveals that the Board majority prejudged

the issues, but also that it sought to implement its prejudgment to affect those representation

campaigns.  This interpretation of events is corroborated by publicly available information.

After the TTD sought a change in the majority rule, the Board continued in almost all cases to

process representation applications and schedule elections under the current majority rule.  *See*

*supra* at n.2.  The Board failed, however, to move forward on the representation applications that

had been filed by the AFA and IAM at Delta.  Those elections involve a large number of

employees at Delta, and AFA had been unsuccessful in prior elections involving Delta flight

attendants.

The delay in processing the applications cannot be explained by a normal application of

the Board's rules or operating procedures.  The RLA requires the Board to certify the results of

its investigation into the identity of the employees' union representative (if any) within 30 days

of the filing of a representation application, 45 U.S.C. § 152, Ninth, and the Board delayed the

processing of the investigations well beyond that period.  Moreover, the AFA and IAM

applications were filed before the filing date for many of the applications that the NMB had

processed to conclusion under the majority rule.  The most natural inference is that the Board

delayed the applications so that AFA and IAM would be able to avoid elections under the

longstanding majority rule—and avail itself of the minority rule, which the Board had

irretrievably committed itself to adopting.

The Board claims that it could not investigate AFA's application until it had resolved the

"issue of the use of hyperlinks in representation elections" raised by AFA's July 22, 2009 request

for reconsideration of its hyperlink policy.  75 Fed. Reg. at 26,067/2.  However, AFA's request

concerning hyperlinks was a general one, not tied to any representation application, and not part

of AFA's representation application for Delta's flight attendants.  *See* Letter from Chairman

Elizabeth Dougherty to Senators Isakson, Corker, Bunning, Bennett, Chambliss, Voinovich, and

Hatch (Oct. 28, 2009) (attached to Smith Decl. as Ex. G).  Accordingly, the Board's explanation

of its delay is implausible, because the issue of the use of hyperlinks was common to all

representation elections (including the applications it processed while it delayed the AFA and

IAM Delta applications), and yet the Board continued to process other applications.  Unless the

Board was prepared to adopt an AFA-specific rule—which would have been inconsistent with its

duty as a neutral referee—its delay cannot be explained on the basis of the hyperlink issue.

Incredibly, the Board's majority fails to offer any explanation of its delay of the IAM's

application, *see* 75 Fed. Reg. at 26,067, leaving unrebutted the inference that the delay was

intended to aid IAM's unionization effort.  Thus, as Chairman Dougherty stated in her letter, the

Board's rush to publish the proposed rule, combined with its delay in processing the AFA and

IAM applications, "contribute[s] to the growing perception that the majority is attempting to

push through a controversial election rule change to influence the outcome of several very large

and important representation cases currently pending at the Board."  Dougherty Nov. 2, 2009

Letter, *supra*, at 2.

Third, the behavior of the unions bolsters that inference.  The AFA boasted about its

efforts (and those of other unions) to effect change "before this election between the Northwest

and the Delta flight attendants [took] place."  Transcription of August 24, 2009 Interview with

AFA-CWA International President Patricia Friend on *The Union Edge* Talk Radio Show 6 (Orig.

Broadcast Aug. 24, 2009) (attached to Smith Decl. as Ex. J).  And both the AFA and the IAM

ultimately withdrew their representation applications in apparent coordination with the Board

and with the apparent understanding that there would be a rule change.  The IAM withdrew its

representation application for the Fleet Service craft or class on October 30, 2009, three business

days before the NMB majority's issuance of the NPRM, and the AFA withdrew its application

on November 3, 2009—the same day that the NPRM was issued.  In addition, in a

contemporaneous press release, the AFA's President expressly stated that "[a]s the largest

private sector union election this year, we want this election at Delta Air Lines to occur under the

new democratic procedures and therefore are withdrawing our single transportation application."

Press Release, AFA, AFA-CWA Applauds National Mediation Board For Proposed Voting

Procedure Change (Nov. 3, 2009) (attached to Smith Decl. as Ex. K).  The AFA President's

statement manifested her understanding that, despite the Board's request for comment, the

change was a foregone conclusion.

Fourth, the Board majority's predetermination of the issues is further underscored by the

facts, described in greater detail above, that the Board's majority (i) failed to identify any

adequate and neutral justifications for its sweeping rule change; (ii) offered no reasoned

application of or justification for abandoning its "compelling reasons" standard for rule changes;

(iii) refused to adopt equivalent decertification and run-off election procedures; (iv) refused to

employ the evidentiary hearing process it has previously said would be needed for a fair

consideration of whether to discard the majority rule; and (v) wrote an argumentative NPRM that purported to defend an outcome as opposed to issuing a neutral invitation for comment. Particularly in light of the Board majority's extraordinary effort to exclude Chairman Dougherty from deliberations, and its delay in processing the applications for elections at Delta, these facts demonstrate that the Board majority predetermined the issues in violation of the APA.

The Board's predetermination of the issues is particularly troubling because it runs directly contrary to the posture of neutrality vis-à-vis carriers and labor organizations required for the Board's performance of its mediation function.  The Board's abandonment of neutrality requires invalidation of the Board's rule.

## II.   THE PARTICIPATING ATA MEMBERS WOULD SUFFER IRREPARABLE INJURY IF THE MOTION FOR A PRELIMINARY INJUNCTION WERE DENIED.

Unless this Court grants a preliminary injunction pending expedited discovery and an expedited final hearing on the merits, ATA's members are likely to suffer irreparable injury. First, ATA's member airlines have unrepresented employees who are, or may soon become, subject to union organizing campaigns.  For example, both AFA and IAM are engaged in organizing campaigns at Delta, and IAM has launched a campaign at AirTran Airways.  Berg Decl. ¶ 8.  These organizing campaigns likely will lead to representation applications.  Indeed, the AFA has publicly stated it intends to re-file its application to represent Delta's flight attendants as soon as the minority rule becomes effective.  In the past 12 months alone, labor organizations filed approximately 40 representation applications with the NMB.  *Id.* ¶ 9.  Absent a preliminary injunction entered prior to the rule's effective date, new applications are likely to be processed—especially in light of Section 2, Ninth's requirement that the Board certify the results of its investigation within 30 days of the filing of a representation application—and the illegal and arbitrary minority rule will be used in the representation proceedings, before the

completion of a final hearing on the merits and a final judgment is issued in this case.  A preliminary injunction is necessary to assure that certifications are issued pursuant to lawful procedures.

Second, while any minority-supported unions are acting as certified representatives, ATA's members would have a statutory obligation to "treat with" those representatives.  *See Virginian Ry.*, 300 U.S. at 548.  That duty would cause a fundamental change in the relationship between a carrier and its employees for the period between the NMB's illegal certification of unions under the minority rule and invalidation of those certifications.  Berg Decl. ¶¶ 5, 8, 11.  Moreover, for any illegal certification that, for whatever reason, is not invalidated following vacatur of the rule, ATA's members would be subject to fundamental changes in their labor relations.  *Id.* ¶ 5.  Because no post-hearing remedy can compensate for these irreparable injuries, a preliminary injunction is necessary.  *See Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (key question is whether "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation"); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) (same).

Third, if unions are certified using the minority rule, and their certification is later invalidated, minority-supported unions will have become incumbents—even though they would not have legitimately earned that status.  A preliminary injunction is necessary to prevent that irreparable harm from occurring.

**III.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION.**

There is no reason to allow the Board to apply the minority rule before this case is resolved on the merits.  The public interest weighs strongly in favor of granting a preliminary injunction.

First, the Board has applied the majority rule for 75 years.  In light of that history, the Board cannot credibly argue that the majority rule inflicts any meaningful harm, or that applying it until this case is resolved would do so.  Were it otherwise, the Board would be responsible for 75 years of meaningful harm to the public interest.  That is obviously not the case; as the Board has itself recognized, the majority rule has allowed employees to vote for unionization when they want to do so, *see supra* 21.

Second, the duration of any injunction will be minimal.  The ATA seeks only minimal discovery before this case is set for a final hearing on the merits, and only with respect to the facts demonstrating that the Board majority did not have an open mind and predetermined the issues.  The ATA has filed a motion with the Court seeking expedited discovery, beginning immediately, so that a final hearing on the merits can be held within 60 days of the entry of a preliminary injunction.  After nearly 75 years of application of the majority rule, there can be no meaningful harm from a preliminary injunction of 60 days duration.

Third, a rush to apply the minority rule is all the less warranted because the Board has continued to process elections under the majority rule.  *See supra* 37-38.  If application of the majority rule were causing harm to the public interest, the Board would certainly not be continuing to apply it.

Fourth, it is in employees' interest not to be asked to participate in an election with a minority rule, only to be forced to return to the ballot box and vote under a majority rule later.

Berg Decl. ¶¶ 5, 10.  A preliminary injunction would avoid this voter confusion, by allowing

continuity with the Board's 75 years of practice until this Court has had an opportunity to

determine whether the attempt to abandon that practice is lawful.

## CONCLUSION

For the foregoing reasons, ATA's motion for a preliminary injunction pending expedited

discovery and an expedited final hearing on the merits should be granted.

Dated:  May 19, 2010                    Respectfully Submitted,

     /s/ Robert A. Siegel
Robert A. Siegel*
O'MELVENY & MYERS LLP
400 South Hope St.
Los Angeles, CA 90071-2899
(213) 430-6000 (telephone)
(213) 430-6407 (facsimile)

Chris A. Hollinger**
O'MELVENY & MYERS LLP
2 Embarcadero Center
San Francisco, CA 94111-3823
(415) 984-8700 (telephone)
(415) 984-8701 (facsimile)

     /s/ Stephen D. Brody
Stephen D. Brody (DC Bar No. 459263)
Irv Gornstein (DC Bar No. 345751)*
Micah W.J. Smith (DC Bar. No. 988330)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006-4001
(202) 383-5300 (telephone)
(202) 383-5414 (facsimile)

*Counsel for Plaintiff Air Transport Association of America, Inc.*

*admitted pro hac vice
**pro hac vice motion pending