UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
AIR TRANSPORT ASSOCIATION                           )
  OF AMERICA, INC., *et al.*,                       )
                                                    )
            Plaintiffs,                             )
                                                    )
      v.                                            )      Civil Action No. 10-0804 (PLF)
                                                    )
NATIONAL MEDIATION BOARD, *et al.*,                 )
                                                    )
            Defendants.                             )
_____)


OPINION

         This matter is before the Court on the parties' cross-motions for summary

judgment.  The Court heard oral argument on the motions on June 21, 2010.  After careful

consideration of the parties' papers and attached exhibits, the Final Rule and portions of the

administrative record, the oral argument made by counsel in open court, and the relevant case

law and statutes, the Court granted the defendants' motions, denied the plaintiffs' motions, and

entered judgment for the defendants on June 25, 2010.  This Opinion explains the reasoning

underlying the Court's June 25 Order.


I.  BACKGROUND

         The National Mediation Board (the "Board"), the federal agency that oversees

labor-management relations involving railroads and airlines, is required by the Railway Labor

Act ("RLA") to investigate representation disputes "among a carrier's employees as to who are

the representatives of such employees . . . and to certify to both parties, in writing . . . the name or

names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and to certify the same to the carrier." 45 U.S.C. § 152, Ninth. The Board may hold an election by secret ballot or use "any other appropriate method" to determine what representative, if any, the employees have selected. Id. The carrier is obligated to "treat" with the certified organization as the employee's bargaining representative. Id.

The Board's traditional policy in conducting elections, which had been in place for 75 years, required that a majority of all eligible voters in the craft or class must cast valid ballots in favor of representation (the "Original Rule") before the Board would certify the election. See Representation Election Procedure, 75 Fed. Reg. 26,062, 26,062 (May 11, 2010) (to be codified at 29 C.F.R. pts. 1202, 1206). This policy was based on the Board's construction of Section 2, Fourth of the RLA. Id.

On May 11, 2010, after an informal rulemaking process involving notice and comment, the Board issued a Final Rule which changed this policy (the "New Rule"). See 75 Fed. Reg. at 26,062. The New Rule amends the Board's rules to provide that, in representation disputes, a majority of the valid ballots that are actually cast will determine the craft or class representative. See id. at 26,062. It does not require that a majority of the craft or class participate in the election.

On May 17, 2010, plaintiff Air Transport Association of America, Inc. ("ATA") filed this lawsuit, asserting that the New Rule violates the RLA, 45 U.S.C. § 152, Fourth, and that it is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. Two days later, ATA moved for a preliminary injunction to enjoin the New Rule from going into effect as scheduled on June 10, 2010. At an initial status

conference, the government agreed to stay the effective date of the New Rule until June 30, 2010, to permit the litigation before the Court to proceed at a more measured pace. In the time since ATA's complaint was filed, numerous parties have intervened on both sides of the case: the Chamber of Commerce and five individual Delta employees as plaintiffs, and the International Brotherhood of Teamsters, the Aircraft Mechanics Fraternal Association, and the United States Airline Pilots Association as defendants.

In connection with the motion for a preliminary injunction, ATA also filed a motion to take expedited discovery to support its contention that two members of the Board acted with unalterably closed minds regarding the New Rule and predetermined the outcome of the rulemaking process in violation of the APA. After hearing oral argument, the Court denied the motion. See Opinion and Order, Dkt. No. 44 (June 4, 2010). Thereafter, because the entire case would be resolved based on the administrative record, which was filed on June 14, 2010, the parties agreed to convert the briefing on ATA's motion for a preliminary injunction into cross-motions for summary judgment.

## II. LEGAL FRAMEWORK

### A. The Administrative Procedure Act

The National Mediation Board's rulemaking is subject to review under Section 706 of the Administrative Procedure Act. See, e.g., U.S. Airways, Inc. v. National Mediation Board, 177 F.3d 985, 989 & n.2 (D.C. Cir. 1999); Ry. Labor Executives' Ass'n v. National Mediation Board, 29 F.3d 655, 672-73 (D.C. Cir. 1994) (Randolph, J., concurring). The standard of review under Section 706 of the APA "is a highly deferential one. It presumes agency action

to be valid." Humane Soc'y of the United States v. Kempthorne, 579 F. Supp. 2d 7, 12 (D.D.C.

2008) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976)).  Nevertheless, a reviewing

court must reject agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if

the agency

> relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).  If the

agency has "considered the relevant factors and articulated a rational connection between the

facts found and the choices made," its decision cannot be considered arbitrary and capricious.

Balt. Gas & Elec. Co. v NLRB, 462 U.S. 87, 105 (1983); see also City of Portland v. EPA, 507

F.3d 706, 713 (D.C. Cir. 2007).

As explained in more detail below, one of the plaintiffs' principal arguments calls

into question the Board's interpretation of the RLA.  When the action under review involves an

agency's interpretation of a statute that the agency is charged with administering, the Court

applies the familiar analytical framework set forth in Chevron U.S.A., Inc. v. Natural Resources

Defense Council, Inc., 467 U.S. 837 (1984).  "Under step one of Chevron, [the court] ask[s]

whether Congress has directly spoken to the precise question at issue, in which case [the court]

must give effect to the unambiguously expressed intent of Congress."  Sec'y of Labor, Mine

Safety & Health Admin. v. National Cement Co. of California, Inc., 494 F.3d 1066, 1073 (D.C.

Cir. 2007) (internal quotation marks and citation omitted); see also Chevron U.S.A., Inc. v.

Natural Resources Defense Council, Inc., 467 U.S. at 842-43. In determining whether Congress

has directly spoken to the precise question at issue, the Court should use all the "traditional tools

of statutory construction," including textual analysis, structural analysis, and (when appropriate)

legislative history. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467

U.S. at 843 n.9; see also Bell Atlantic Tel. Co. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997). If,

after employing these tools, the Court concludes that "the statute is silent or ambiguous with

respect to the specific issue . . . , [the Court] move[s] to the second step and defer[s] to the

agency's interpretation as long as it is 'based on a permissible construction of the statute.'"

Sec'y of Labor, Mine Safety & Health Admin. v. National Cement Co. of California, Inc., 494

F.3d at 1074 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.

at 843); see also In Defense of Animals v. Salazar, 675 F. Supp. 2d 89, 94 (D.D.C. 2009).

In the D.C. Circuit, Chevron step two review is similar to (but conceptually

distinct from) the standard "'arbitrary and capricious' style analysis" described in the first

paragraph of this subsection. Continental Airlines, Inc. v. DOT, 843 F.2d 1444, 1452 (D.C. Cir.

1988).[1] Thus, a "'reasonable' explanation of how an agency's interpretation serves the statute's

objectives is the stuff of which a 'permissible' construction is made . . . ; an explanation that is

'arbitrary, capricious, or manifestly contrary to the statute,' however, is not." Northpoint

Technology Ltd. v. FCC, 412 F.3d 145, 151 (D.C. Cir. 2005) (quoting Chevron U.S.A., Inc. v.

Natural Resources Defense Council, Inc., 467 U.S. at 844). "'Reasonableness' in this context

---

[1]     The Court disagrees with those commentators who regard this distinction as
unnecessary and confusing. See, e.g., 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE
§ 3.6 at 174 (4th ed. 2002). In any event, this Court is bound by the law of this Circuit. See
Humane Soc'y of U.S. v. Kempthorne, 579 F. Supp. 2d at 13 n.7.

means . . . the compatibility of the agency's interpretation with the policy goals . . . or objectives

of Congress." Continental Airlines Inc. v. DOT, 843 F.2d at 1452. As a result, "the critical point

is whether the agency has advanced what the Chevron Court called 'a reasonable explanation for

its conclusion that the regulations serve the . . . objectives [in question].'" Continental Airlines

Inc. v. DOT, 843 F.2d at 1452; see also 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW

TREATISE § 3.6 at 172-73 (4th ed. 2002) (under Chevron step two, courts must determine, among

other things, "whether the agency adequately discussed the relationship between the

interpretation and pursuit of the goals of the statute").[2]

## B. Summary Judgment

Summary judgment may be granted "if the pleadings, the discovery and disclosure

materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any

material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P.

56(c). In a case involving review of a final agency action under the Administrative Procedure

Act, 5 U.S.C. § 706, however, the Court's role is limited to reviewing the administrative record,

so the standard set forth in Rule 56(c) does not apply. See Catholic Health Initiatives v. Sebelius,

658 F. Supp. 2d 113, 117 (D.D.C. 2009); Cottage Health Sys. v. Sebelius, 631 F. Supp. 2d 80,

89-90 (D.D.C. 2009). "Under the APA, it is the role of the agency to resolve factual issues to

arrive at a decision that is supported by the administrative record, whereas 'the function of the

---

[2]      A court must be particularly deferential to an agency's interpretation of a statute
that it administers so long as that interpretation is "reasonable, consistent with the statutory
purpose, and not in conflict with the statute's plain language." OSG Bulk Ships v. United States,
132 F.3d 808, 814 (D.C. Cir. 1998); see also Colorado River Cutthroat Trout v. Kempthorne, 448
F. Supp. 2d 170, 175 (D.D.C. 2006).

district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Catholic Health Initiatives v. Sebelius, 658 F. Supp. 2d at 117 (quoting Cottage Health System v. Sebelius, 631 F. Supp. 2d at 90). Summary judgment serves as "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review," but the normal summary judgment standard does not apply. See id.; see also Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995).

## III. DISCUSSION

At issue in this case is the section of the Railway Labor Act that provides: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this [Act]." 45 U.S.C. § 152, Fourth ("Section 2, Fourth"). Plaintiffs assert that the New Rule is unlawful because: (1) it conflicts with the plain text of Section 2, Fourth; (2) it is an unreasonable interpretation of Section 2, Fourth; and (3) both the Rule and the process by which it was promulgated are arbitrary and capricious under the APA. The Court will address these arguments in turn.[3]

---

[3]     The Delta employee plaintiff intervenors also assert that the New Rule violates the Constitution of the United States because it would require employees who do not wish to be represented to accept a bargaining agent that was not selected by the majority of employees, which, they assert, is in contravention of their free association and due process rights. The Court rejects this argument based on the rationale in Virgin Atlantic Airways, Ltd. v. National Mediation Board, 956 F.2d 1245, 1251-52 (2d Cir. 1992).

*A. Chevron Step One: The RLA Is Ambiguous*

Plaintiffs argue that Section 2, Fourth unambiguously provides that a representative may be certified by the Board only if a majority of eligible employees in the craft or class vote in favor of union representation. See Complaint ¶ 2. They argue that the phrase "majority of any craft or class" does not mean "majority of voters," and therefore that determining a representative based only on the majority of votes cast does not ensure that the majority of the craft or class has exercised the right provided by Congress in Section 2, Fourth. In addition, according to plaintiffs, the phrase "right to determine" cannot be equated with a "right to participate." Rather than giving all members of the craft or class only the opportunity to vote, plaintiffs say that Section 2, Fourth requires that a majority of the craft or class affirmatively select the representative, if any, before the Board is empowered to certify that representative. Because the New Rule does not require that a majority of eligible employees select the representative, plaintiffs maintain that it conflicts with the plain meaning of the RLA.

Plaintiffs' interpretation of the statute reads strictness into the statutory text where none exists. Contrary to plaintiffs' reading, nothing in the statute unambiguously requires that a majority of all eligible voters select the representative of the employees. Nor by its terms does it even require that a majority of all eligible employees vote in order for the election to be valid. Indeed, Section 2, Fourth is completely silent as to how an employee may exercise his or her right to determine a representative. This silence creates ambiguity in the statute. The Court's conclusion that the statutory language is ambiguous is supported by the case law, the structure of the statute as a whole, and what minimal legislative history exists.

1.  <u>Virginian Railway</u> and Subsequent Cases

The Supreme Court considered the statutory language at issue in <u>Virginian Railway Co. v. System Federation No. 40</u>, 300 U.S. 515 (1937), a decision which, although more than seventy years old, still guides analysis of the statute.  In <u>Virginian Railway</u>, the petitioner challenged the certification of a union that obtained the majority of votes cast, but not a majority of the craft or class as a whole, arguing that a representative must be selected by a majority of all eligible voters.  <u>Id</u>. at 560.  The Supreme Court rejected this argument and upheld the certification, stating:

> It is to be noted that the words of the section confer the right of determination upon a majority of those eligible to vote, but is silent as to the manner in which that right shall be exercised. Election laws providing for approval of a proposal by a specified majority of an electorate have been generally construed as requiring only the consent of the specified majority of those participating in the election. . . . Those who do not participate are presumed to assent to the expressed will of the majority of those voting. . . . We see no reason for supposing that section 2, Fourth, was intended to adopt a different rule.

<u>Id</u>. at 560 (internal citations and quotations removed).  By treating nonvoters as acquiescing in the outcome of a representation election, the New Rule relies on the principle that nonvoters are presumed to assent to the expressed will of the majority of those voting, a principle that is undisputedly consistent with the language of Section 2, Fourth as interpreted by the Supreme Court in <u>Virginian Railway</u>.  <u>See</u> <u>NLRB v. Standard Lime & Stone Co.</u>, 149 F.2d 435, 437 (4th Cir. 1945) (<u>Virginian Railway</u> applied the principle that nonvoters assent to the will of the majority to industrial elections); <u>see</u> <u>also</u> <u>NLRB v. Singleton Packing Corp.</u>, 418 F.2d 275, 279

(5th Cir. 1969); Continental Airlines v. National Mediation Board, 793 F. Supp. 330, 334 n. 5 (D.D.C. 1991).

It is true that in Virginian Railway the Supreme Court emphasized the fact that a majority of blacksmiths had actually participated in the election: "If, *in addition to participation by a majority of a craft*, a vote of the majority of those eligible is necessary for a choice, an indifferent minority could prevent the resolution of a contest. . . ." Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. at 560 (emphasis added).[4] Thus, the Court did not reach the question of whether Section 2, Fourth permitted certification of an election in which only a minority of employees participated. Despite plaintiffs' arguments to the contrary, however, there is nothing in Virginian Railway that requires a majority of the craft or class to participate in a representation election in order to make that election valid. To this Court's knowledge, no court has applied Virginian Railway to actually prohibit certification of an election under the RLA in which a minority of voters participated.

Plaintiffs argue that the District of Columbia Circuit's decision in Brotherhood of Railway & Steamship Clerks v. United Transport Service Employees, 137 F.2d 817 (D.C. Cir.), rev'd per curiam on other grounds, 320 U.S. 715 (1943), has interpreted Virginian Railway as requiring that a majority of all eligible voters must participate in an election, and therefore that the case should guide this Court's analysis. Citing Virginian Railway, the court of appeals

_____

[4]       The union in Virginian Railway initially also sought to represent another craft of employees at the railroad based on a vote in which the majority of voters supported representation, but only a minority of employees participated in the election. The district court ruled that designating the union as a representative based on such an election was invalid, a determination that was not appealed and which the Supreme Court therefore did not discuss. See Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. at 559.

stated: "[T]he majority of any craft or class shall have the right to determine who shall be their representative, which means the majority of the votes cast at an election, *provided a majority of those eligible to vote have participated*." Id. at 819 (emphasis added). There is a statement by the District of Columbia Circuit 25 years later, however, that suggests that the RLA *would permit* certification of an election in which a majority did not participate should the Board ever adopt such a policy. This Court will follow the current view of the Circuit rather than its much earlier *dicta*.[5]

In International Brotherhood of Teamsters v. Brotherhood of Railway, Airline, and Steamship Clerks, 402 F.2d 196 (D.C. Cir. 1968), the District of Columbia Circuit concluded that while the National Mediation Board "does not utilize the presumption, used by the National Labor Relations Board, that non-voters concur in the wishes of the majority of voters, thereby [in the NLRB's case] permitting certification regardless of whether a majority of employees participate in the election," id. at 203-04, "[t]he choice of what policy to follow [under the RLA] is essentially for the Board to make." Id. at 204. In the accompanying footnote the court stated:

> The Attorney General supported . . . the NMB's power to certify an authorized employee representative *even though a majority of the employees did not participate in the election*, relying on Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515 (1937). There the Court upheld the use of a presumption that non-voters concur

---

[5]    In interpreting the National Labor Relations Act, the Second Circuit noted in Marlin-Rockwell Corp. v. NLRB., 116 F.2d 586, 588 (2d Cir. 1941), that "[u]nder the Railway Labor Act it has been authoritatively held that the vote of a majority of the participants determines the choice, if the election was participated in by a majority of the employees entitled to vote." In light of the more recent case law in this Circuit supporting the conclusion that the RLA does not require majority participation in an election, the Court will not follow either the *dicta* in the 1943 decision of this Circuit in Brotherhood of Railway & Steamship Clerks v. United Transport Service Employees or the *dicta* in the 1941 decision of the Second Circuit in Marlin-Rockwell Corp.

> in the wishes of the majority of voters. That case might be
> distinguished because a majority of the employees in the unit did
> participate, and the Court noted that fact. However, the Court's
> reliance in <u>Virginian Ry</u>. on an analogy to political elections served
> to support NLRB power to *certify a union even where a majority of*
> *the unit did not participate in the election*, <u>e.g.</u>, <u>Nat'l Labor</u>
> <u>Relations Bd. v. Standard Lime & Stone Co.</u>, 149 F.2d 435 (4th
> Cir.), cert. denied, 326 U.S. 723 (1945)).

<u>Id</u>. at 204 n.16 (emphasis added). The court of appeals therefore has acknowledged that

<u>Virginian Railway</u> leaves open the possibility that an election could be certified under the RLA

even though only a minority of voters actually voted, <u>see</u> <u>id</u>. at 204 n.16, and that the choice to be

made is a policy decision for the Board. <u>Id</u>. at 204.[6]

In <u>Continental Airlines, Inc. v. National Mediation Board</u>, 793 F. Supp. 330

(D.D.C. 1991), Judge Richey approved the Board's certification of a transfer of representation

from one union to another following a merger and a vote by the relevant group of employees

approving the merger, even though the voting group of employees was a *minority* of eligible

employees. <u>Id</u>. at 333-34. Judge Richey concluded that relying on a vote regarding a union

transfer in which only a minority of eligible employees voted and only a plurality approved the

transfer did not violate the RLA because the RLA did not require a Board-sponsored election in a

transfer case — unlike for a union certification, where a vote is required. <u>Id</u>. But Judge Richey

also stated:

---

[6] The court of appeals relied in part on the Supreme Court's then recent decision in
<u>Brotherhood of Railway & Steamship Clerks v. Association for the Benefit of Non-Contract</u>
<u>Employees</u>, 380 U.S. 650 (1965), in which the Supreme Court again recognized the broad
discretion of the Board in ascertaining representation and establishing rules to govern elections.
<u>Id</u>. at 668-71.

> Even in election cases, the NMB has discretion to treat a nonvoter as either (1) acquiescing in the will of the majority or (2) voting for no representation.  Compare Virginian Ry. v. System Federation, 300 U.S. 515, 560, 605-06 (1937) (upholding NMB certification because nonvoters "are presumed to assent to the expressed will of the majority of those voting") with Ry. Clerks, 380 U.S. at 670 (upholding practice in NMB-sponsored elections that "if the employee refuses to vote, he is treated as having voted for no representation").

Continental Airlines, Inc. v. National Mediation Board 793 F. Supp. at 334 n. 5.

As Judge Joiner, of the United States District Court for the Eastern District of Michigan, explained when approving the Board's certification of a union which received only a plurality of the total votes cast in an election:

> According to [the carrier,] "majority" in this statute plainly and unequivocally means "absolute majority of all eligible voters." This simply is not the case.  "Majority of any craft of class" is sufficiently ambiguous that it must be construed like most other statutory language.  It might mean majority of all eligible voters; it might mean majority of those voting; or it might mean what the NMB has interpreted it to mean.

> The important point is that the NMB has been given the discretion to determine who shall be the employees' representative, by any "appropriate method", and "in such manner as shall insure the choice of . . . the employees without interference, influence, or coercion exercised by the carrier."  45 U.S.C. § 152, Ninth.  That discretion includes the authority to reasonably construe the language of the statute.  Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297 (1943); Brotherhood of Railway & Steamship Clerks v. Association for the Benefit of Non-Contract Employees ("Railway Clerks") 380 U.S. 650 (1965).

Zantop Int'l Airlines, Inc. v. National Mediation Board, 544 F. Supp. 504, 506 (E.D. Mich. 1982), aff'd 732 F.2d 517 (6th Cir. 1984).

Also instructive is the District of Columbia Circuit's National Labor Relations Act ("NLRA") jurisprudence.[7]  The NLRA provides for representatives to be selected "by the majority of the employees in a unit appropriate for such purposes."  29 U.S.C. § 159(a).  The National Labor Relations Board treats this statute as permitting certification of a representative that received the majority of votes in an election even though only a minority of employees actually voted, an interpretation which multiple courts of appeals, including the United States Court of Appeals for the District of Columbia Circuit, have found permissible.  See NLRB v. Central Dispensary & Emergency Hosp., 145 F.2d 852, 853 (D.C. Cir. 1944) ("[T]he election in this case was carried by a majority of the minority. . . .  This question [whether election by a minority is authorized] seems to us to be settled by the Virginian Railway case," the holding of which cannot be distinguished on the ground that an actual majority of eligible voters in fact voted in Virginian Railway).  See also NLRB v. Singleton Packing Corp., 418 F.2d at 279 (certifying election under the NLRA where only a minority of employees participated as the result of management urging nonparticipation, because "[i]n applying the principle of Virginian Railway [that nonvoters assent to the will of the majority] to the National Labor Relations Act, this Court has pointed out that like the Railway Labor Act, § 9 does not expressly provide what

---

[7]        While the Court is mindful of the Supreme Court's instruction that the NLRA "cannot be imported wholesale into the railway labor arena," Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants, 489 U.S. 426, 439 (1989), it finds cases decided under the NLRA instructive as to the meaning of the text of the RLA because the two statutes use such similar language in this context.  Compare 45 U.S.C. § 152, Fourth ("majority of any craft or class of employees shall have the right to determine") with 29 U.S.C. § 159(a) ("[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit. . . .").

sort of majority shall control the result of an election"); NLRB v. National Mineral Co., 134 F.2d 424, 426-28 (7th Cir. 1943); NLRB v. Whittier Mills Co., 111 F.2d 474, 477-78 (5th Cir. 1940).

### 2. Section 2, Fourth in the Context of the Statutory Scheme

Evaluating Section 2, Fourth within the context of the statutory scheme of the RLA as a whole further supports the conclusion that Section 2 Fourth is ambiguous.[8]  The RLA gives the Board the authority to resolve representation disputes pursuant to Section 2, Fourth by

> secret ballot of the employees involved, or [by] any other
> appropriate method of ascertaining the names of their duly
> designated and authorized representatives in such manner as shall
> insure the choice of representatives by the employees without
> interference, influence, or coercion exercised by the carrier. . . .
> [T]he Board shall designate who may participate in the election
> and establish the rules to govern the election.

45 U.S.C. § 152, Ninth.  As the Supreme Court has observed, under Section 2, Ninth the Board has broad discretion to determine the method of resolving representation disputes, so broad in fact that balloted elections are not even required.  See Brotherhood of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Employees, 380 U.S. at 668-69 (the RLA "leaves the details [of selecting representatives] to the broad discretion of the Board with only the *caveat* that it 'insure' freedom from carrier interference").  This grant of broad discretion supports the conclusion that under Section 2, Fourth the Board has discretion to determine by what means a majority of a craft or class may exercise the "right to determine" who shall be their representative, if they choose to have one.

---

[8]       Analysis of plain language of the statute "does not end [with the language of the relevant provision], but must continue to 'the language and design of the statute as a whole.'" American Scholastic TV Programming Found. v. FCC, 46 F.3d 1173, 1178 (D.C. Cir. 1995) (quoting Fort Stewart Schools v. FLRA, 495 U.S. 641, 645 (1990)).

Consistent with the broad discretion given by Section 2, Ninth, the Board has used various procedures to certify union representatives, many of which, like those used in Zantop, did not require an affirmative vote by a majority of the craft or class for a specific union.  See Zantop Int'l Airlines, Inc. v. National Mediation Board, 544 F. Supp at 506 (Board has authority to certify union based on majority of ballots cast, even if union does not receive votes from majority of total employees); Key Airlines, 16 NMB 296, 312 (1989) (union will be certified unless the majority of eligible voters casts votes against representation); Laker Airlines, 8 NMB 236, 257 (1981) (permitting certification of union based on election in which the "desires of the majority of those actually casting valid ballots will determine the outcome of the elections, whether or not a majority of those eligible participate in the elections").  The New Rule promulgated by the Board is consistent with the Board's broad discretion  to investigate representation disputes and to decide how a majority of a craft or class shall exercise its right to determine a representative under the RLA.

### 3.  Legislative History

Little legislative history exists, but the Senate Report that accompanied the 1934 amendment to the RLA creating the National Mediation Board states that "[t]he bill specifically provides that the choice of representatives of any craft shall be determined by a majority of the employees voting on the question."  S. REP. NO.73-1065, at 2 (1934).  This statement at the very least supports the conclusion that the statute is ambiguous as to whether a majority of a craft or class must actually vote in a representation election or whether a representative may be certified based on the majority of votes actually cast.  Cf. Brotherhood of Ry. & S.S. Clerks v. Ass'n for

Benefit of Non-Contract Employees, 380 U.S. at 669 ("That the details of selecting representatives were to be left for the final determination of the Board is buttressed by legislative history clearly indicating as much.").[9]

Based on the text of the RLA, the cases interpreting it, the statutory structure as a whole, and its legislative history, the Court concludes that the statute is ambiguous. The Court therefore will move from analysis under Chevron step one to Chevron step two.

B. *Chevron Step Two: The Board's Interpretation of the Statute Is Reasonable*

In the Final Rule, the Board explained that it was changing its representation election procedures because the change "will more accurately measure employee choice in representation elections," 75 Fed. Reg. at 26,072, and will allow the Board "to determine each individual's true intent with regard to representation." Id. at 26,073. It reached this conclusion for a number of reasons. Among these, the Board noted, is that the New Rule will

> no longer impose a position on those who abstain from participating in a representation election by treating nonparticipation as a vote against representation. Employees who are opposed to representation will have the opportunity to vote according to that view. Employees who have no opinion about a representation dispute or wish to abstain from voting for any reason will no longer be counted as a vote against representation.

Id. at 26,073-74. The Board discussed evidence that not all non-voters choose not to vote because they actually oppose representation. Id. at 26,073. The Board took note of empirical evidence that showed that in so-called Laker elections, which include a ballot option of "no

---

[9]     The D.C. Circuit has stated: "[W]e may consider a provision's legislative history in the first step of Chevron analysis to determine whether Congress' intent is clear from the plain language of a statute." City of Cleveland v. U. S. Nuclear Regulatory Comm'n, 68 F.3d 1361, 1366 n.4 (D.C. Cir. 1995).

union," employees still fail to vote at a rate of about twelve percent.  See id.  Employees might

fail to vote because they are traveling or sick, because of apathy, because of pressure not to vote,

because of religious conviction against voting, or when furloughed and therefore out of touch

with other employees.  See id.  By no longer imposing the presumption that these non-voters are

"no" votes, the Board explained, it will "more accurately determine the employees' choice of

representative."  Id.

        The Board also discussed the "changed circumstances" that support its conclusion

that the New Rule is a better measure of employee intent than the Original Rule.  75 Fed. Reg. at

26,074.  It explained that "there is evidence that the [Original Rule's] procedures were adopted in

response to an era of widespread company unionism within railroads, a factor that has ceased to

be an issue in the railroad industry."  Id.  Indeed, carrier influence over union organization and

representation was "the principal target of the 1934 amendments" creating the Board.  Id.  In

light of those circumstances, according to the current Board, the 1934 Board "likely concluded

that requiring a majority of eligible voters to vote in favor of representation by an independent

union would more effectively demonstrate employee intent to those carriers who had just

previously refused to voluntarily recognize these independent unions."  Id.

        In addition to the disappearance of company unions, in the time since the Original

Rule was first developed, union participation of any kind has decreased in the railroad and airline

industries.  As the Board explained:

> Because almost all employees were already organized and most
> elections involved disputes between unions, the NMB's early
> election ballots provided a choice among representatives without
> the option to vote against representation.  The high degree of
> organization in the railroad industry at that time led to the

> assumption that all class or crafts would be organized and for this
> reason, there was likely no consideration given to the possibility
> that employees would vote against representation. These factors
> no longer exist today.

75 Fed. Reg. at 26,074. The assumption that the primary issue to be decided in a representation election was between competing unions, rather than between a union and no union, contributed to the balloting procedure under the Original Rule which did not give an employee the option of voting "no" or otherwise "cast[ing] a ballot against representation." Id. With the passage of time, "[t]here is no longer the assumption in either the railroad or airline industries that all class or crafts will be organized, yet there remains no way for employees to vote against representation." Id.

The Board's explanation of its reasons for adopting the New Rule shows that the New Rule is compatible with the Board's statutory mission to investigate representation disputes and to determine the employees' selection of a representative "in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." 42 U.S.C. § 152, Ninth. And for the reasons discussed in Section III.A, the New Rule is not inconsistent with or prohibited by the plain the language of Section 2, Fourth. See supra at 8-15. The New Rule therefore is a reasonable construction of the statute by the agency charged with its administration and therefore is entitled to deference. See OSG Bulk Ship v. United States, 132 F.3d at 814; Continental Airlines Inc. v. DOT, 843 F.2d at 1452.

Plaintiffs argue that the fact that the Board employed the Original Rule for 75 years necessarily makes the change to the New Rule unreasonable under Chevron step two. It is established, however, that a change in existing policy does not require a heightened standard of

review or additional or special explanation under the APA.  See <u>FCC v. Fox TV Stations, Inc.</u>, 129 S. Ct. 1800, 1811 (2009); <u>National Cable & Telecomm. Ass'n v. FCC</u>, 567 F.3d 659, 669 (D.C. Cir. 2009); <u>Westar Energy, Inc. v. FERC</u>, 568 F.3d 985, 989 (D.C. Cir. 2009).  As Judge Tatel said for the court in <u>National Cable</u>: "[T]he existence of contrary agency precedent gives [a reviewing court] no more power than usual to question the [Board's] substantive determinations. We still ask only whether the [Board] has adequately explained the reasons for its current action and whether those reasons themselves reflect a 'clear error of judgment.'"  <u>National Cable Telecomm. Ass'n v. FCC</u>, 567 F.3d at 669.  See also <u>Ry. Labor Exec. Ass'n v. National Mediation Board</u>, 29 F.3d at 669 (when considering a challenge to the Board's proposed change to a procedure that had been in place for fifty years, "the mere fact that the [National Mediation] Board never before has claimed the authority embodied in [newly issued procedures] does not mean that such authority, if granted by Congress, has ceased to exist.").  The Court concludes that the New Rule is reasonable and thus permissible under <u>Chevron</u> step two.[10]

---

[10]     The Supreme Court's very recent decision in <u>New Process Steel v. NLRB</u>, No. 08-1457, slip op. (U.S. June 17, 2010) does not change this conclusion.  In that case the Supreme Court concluded that a change by the National Labor Relations Board to its quorum requirements conflicted with the relevant statutory language and the legislative scheme as a whole.  <u>Id</u>. at 4-7. As the Chamber of Commerce points out, the Supreme Court also stated that the fact that its interpretation of the statute "is consistent with the Board's long-standing practice is persuasive evidence that it is the correct one."  <u>Id</u>. at 8.  The Supreme Court did not suggest, however, that if the Board's change in practice was permitted by the plain language of the statute a change to long-standing practice *alone* would render the agency action unlawful.

*C. The Board's Issuance of the New Rule Was Not Arbitrary and Capricious*

Plaintiffs raise numerous arguments in support of their view that the Board's issuance of the New Rule was arbitrary and capricious and therefore that the Rule must be set aside under the APA. They assert that the Board has not provided a neutral and rational basis for the substantive rule change. They argue that the Board's refusal simultaneously to adopt a parallel decertification procedure and to allow a "no union" option during run-off elections is arbitrary and capricious and discriminates in favor of unions. They maintain that the Board has arbitrarily and capriciously failed to adhere to its own precedent that, in their view, requires that no rule change be made absent "compelling reasons" and a full evidentiary hearing. Finally, the plaintiffs argue that the majority of the Board unlawfully predetermined the issues.

1. The Board has Provided a Neutral and Rational Basis for Adopting the New Rule

Much of the analysis regarding the Board's stated reasons for its promulgation of the New Rule overlaps with that under <u>Chevron</u> step two. <u>See</u> <u>Continental Airlines, Inc. v. DOT</u>, 843 F.2d at 1451-52. As the Court explained above, the Board's decision to adopt the New Rule because, in the Board's view, it better measured employee intent is consistent with the Board's mission under the RLA. <u>See</u> *supra* at 17-20. The Board has shown that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better," which is all that is required under the APA. <u>FCC v. Fox TV Stations, Inc.</u>, 129 S. Ct. at 1811.

Plaintiffs argue that Original Rule was based on the factual premise that it contributed to labor stability, and, in their view, the Board has not adequately addressed how the

New Rule will affect labor stability.  In the Final Rule, however, the Board addressed substantively  commenters' concerns regarding the possibility that the New Rule would contribute to labor instability.  See 75 Fed. Reg. at 26,076-78.  For example, the Board noted that under so-called Laker and Key elections, neither of which require majority participation, there has been no increase in labor instability.  See id. at 26,076.  It further noted that "no concrete evidence has been presented in support of the argument that the proposed rule change will lead to instability in the form of increased strikes or work stoppages in the industries.  The specific procedure at issue in the [Notice of Proposed Rulemaking] is not linked to the stability cited by many commenters."  Id. at 26,076.  The Board concluded that labor stability has been attributed over the years to the Act's mediation process, the existence of collective bargaining agreements, and the restriction on carrier interference in representation matters, which would not be affected by the proposed rule.  See id. at 26,077.[11]

Although plaintiffs disagree with the Board's conclusion, the Board engaged substantively with the question of whether the New Rule would lead to a decrease in labor stability, determined that it would not, and adequately explained the reasoning supporting this conclusion.  No more is required under the APA.  See City of Portland v. EPA, 507 F.3d at 713 (quoting National Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007))

_____

[11]     Although the Board previously had noted that labor stability was a benefit of the Original Rule, see Chamber of Commerce, 14 N.M.B. 347, 362 (1987) ("certification based upon majority participation promotes harmonious labor relations"); In Re: Delta Airlines, 35 N.M.B. 129, 131 (2008) (citing Chamber of Commerce), it pointed out that it did not engage in any sort of extensive factual analysis as to labor stability when adopting the Original Rule.  See 75 Fed. Reg. at 26,074 ("[T]here is little evidence that there were strong policy reasons for the prior Board's adoption of the current representation rules [the Original Rule] . . . . [T]he 1934 Board initially adopted the current representation election rules based on 'what seemed to the Board best from an administration point of view.'").

("We must uphold an agency's action where it 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.'").

 2. The Board's Decision Not to Change the Decertification Procedure
or to Allow a No Union Option in Run-Off Elections Was Not Arbitrary and Capricious

Plaintiffs argue that the New Rule is arbitrary and capricious because the Board did not also change the decertification procedures or adopt a "no union" option for run-off elections. Failing to do so, according to plaintiffs, arbitrarily discriminated in favor of unions. As an initial matter, the Court notes that the Board considered the possibility raised by commenters that the New Rule made unionization easier, and rejected it:

> [T]he Board has not proposed this change to increase the rate of union success in representation elections. . . . Any predictions about whether unions will be more successful under the procedures outlined in that NPRM are mere speculation, as demonstrated by the conflicting viewpoints presented by the commenters about union success rates. Many factors beyond the control of the Board affect whether a union will be successful in an election, including the economy, the culture among employees in the craft or class, resources utilized by unions and carriers during the election process, and the reputation of the union.

75 Fed. Reg. at 26,075.[12]

With regard to decertification, the Board does not have a formal union decertification rule, and instead uses a process in which the majority of employees in the craft or class sign individual authorization cards to select an individual (known as the "straw man") to

---

[12]    The RLA does not require equality of treatment between unions and management, just that employees retain the option of rejecting collective representation. See Brotherhood of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Employees, 380 U.S. at 669 n. 5 (under the RLA "employees are to have the option of rejecting collective representation"); Int'l Brotherhood of Teamsters v. Brotherhood of Ry, Airline, & S.S. Clerks, 402 F.2d at 202-03 (the Board has the power to certify that no representative exists).

run against the incumbent union, with the understanding that if elected the challenger will disclaim collective representation if he or she is elected. See 75 Fed. Reg. at 26,078. The Board considered the possibility of engaging in simultaneous changes to this decertification procedure and declined to do so, explaining that "the method it uses to measure employee intent in representation elections is not intertwined with decertification." Id. In response to commenters who sought to have the decertification process made more straightforward, it noted that "existing election procedures allow employees to rid themselves of a representative," and that the New Rule permits employees for the first time to vote for "no union" in a representation election. The Board also declined to change the showing of interest requirement to initiate decertification procedures because in the Board's view doing so would cause an increase in representation elections and thereby contribute to labor instability. See 75 Fed. Reg. at 26,079.[13]

Plaintiffs also argue that the Board's refusal to change run-off election ballots to include a "no union" option is arbitrary and capricious. The New Rule provides that a ballot in an initial election between two unions will allow employees to vote for the first union, for the second union, or for no union. If none of the options receives a majority of votes cast, but collectively the majority of votes are for representation of some kind, the Board's practice has been and will continue to be to hold a run-off election in which the employees' choices will be between the two potential representatives that received the highest number of votes cast in the first election. See 75 Fed. Reg. at 26,081-82. The Board rejected the argument that there is no basis to aggregate votes in favor of representation and explained that "where a majority of

_____

[13]     To initiate a representation election, only thirty-five percent of currently unrepresented employees must show interest, while over fifty percent of employees who are already represented must show interest. See 75 Fed. Reg. at 26,079.

employees indicate a preference for representation, the Board's duty is to determine which individual or organization is the ultimate employee choice through a run-off election." Id. at 26,082. While the Court expressed its misgivings about this procedure during oral argument, the Court cannot say that this is an irrational or arbitrary conclusion.

The Board considered the requests made by commenters regarding decertification and run-off procedures, weighed the reasons given by the commenters, decided not to adopt the commenters' suggestions, and explained its reasons for doing so. This is adequate under the APA. See City of Portland v. EPA, 507 F.3d at 713; Defenders of Wildlife v. Gutierrez, 484 F. Supp. 2d 44, 51 (D.D.C. 2007).

### 3. The Board's Internal Procedures

Plaintiffs also argue that even if the change in policy effectuated by the New Rule is not substantively arbitrary and capricious or in violation of law under the APA, the Board arbitrarily and capriciously failed to adhere to its own precedent regarding required rulemaking procedures. They assert that the Board previously committed not to engage in rulemaking absent a full evidentiary hearing and not to change a rule without compelling reasons. While they acknowledge that these procedures are not required by the APA, when an agency action "is based upon a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed." Int'l Fabricare Inst. v. EPA, 972 F.2d 384, 396 (D.C. Cir. 1992) (quoting Vitarelli v. Seaton, 359 U.S. 535, 546-47 (1959) (Frankfurter, J., concurring in part and dissenting in part)). On the other hand, an agency need not adhere to internal procedures that exceed those provided by the APA in perpetuity. As now Chief Justice

Roberts explained for the D.C. Circuit: "Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" Ramaprakash v. FAA, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003) (quoting Greater Boston Telev'n Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970).

The questions before the Court on this issue therefore are: (1) whether the Board previously committed itself either to providing an evidentiary hearing in connection with a rulemaking or to declining to change a rule in the absence of compelling reasons; (2) if so, whether the Board adhered to these procedures in issuing the New Rule; and (3) if not, whether the Board provided a reasoned analysis for its departure from the procedures.

With regard to an evidentiary hearing, plaintiffs purport to find support for their argument that the Board required such a process in two prior Board decisions, Chamber of Commerce, 13 N.M.B. 90 (1986), and In Re: Delta Airlines, Inc., 35 N.M.B. 129 (2008). In Chamber of Commerce, the Board held an evidentiary hearing in response to a petition requesting it to initiate a rulemaking proceeding because the hearing was "the most appropriate method of gathering information and evidence it [would] need" in deciding whether or not to initiate the proceeding. Chamber of Commerce, 13 N.M.B. at 94. But the Board in Chamber of Commerce was considering a pre-rulemaking petition, not "the actual rule-making process, a process which the Board ha[d] not initiated at th[at] time. . . ." Id. at 93. There therefore is no basis whatsoever from which to extrapolate from that decision that the Board intended to apply the Chamber of Commerce procedures to a rulemaking like the one at issue here. The Board

never suggested that a full evidentiary hearing would be appropriate in proposing a rule or engaging in formal or informal rulemaking under the APA.

In <u>Delta Airlines, Inc.</u> the Board considered and rejected a proposed change to balloting procedures. Unlike the case before the Court, it had not issued a Notice of Proposed Rulemaking or engaged in any other informal rulemaking procedures under the APA. Moreover, although the Board stated that it would not make "such a fundamental change [in balloting procedure] without utilizing a process similar to the one employed in <u>Chamber of Commerce</u>," <u>In Re: Delta Airlines, Inc.</u>, 35 N.M.B. at 132 (citing <u>In re Chamber of Commerce</u>, 13 N.M.B. 90), it said nothing about requiring a full evidentiary hearing and suggested only that all that was necessary was "a complete and open administrative process to consider the matter." <u>In Re: Delta Airlines, Inc.</u>, 35 N.M.B. at 132. Because the Board's precedent did not require an evidentiary hearing in connection with a proposed rulemaking, the Board's decision not to conduct one was not arbitrary and capricious.[14]

Plaintiffs also assert that in order to change a rule, under the Board's own precedent it must not only identify a reasoned basis for the rule change, but also must provide compelling reasons for the change. In <u>Chamber of Commerce</u>, 14 N.M.B. 347 (1987), the Board stated that because it had "a long-standing policy of amending its rules only when required by statute or essential to the administration of the Act, it follows that those seeking rule changes

---

[14] Even if an evidentiary hearing were required by the Board's own precedent, however, the Board adequately explained in some detail why it declined to follow <u>Chamber of Commerce</u> and <u>Delta Airlines, Inc.</u> and why it concluded that the traditional APA notice and comment procedures were the appropriate procedural course. <u>See</u> 75 Fed. Reg. at 26,070-71. No more was required under the APA. <u>See</u> <u>Chemical Waste Mgmt., Inc. v. EPA</u>, 873 F.2d 1477, 1481 (D.C. Cir. 1989) (change in procedures permissible provided new interpretation by agency "is otherwise legally permissible and is adequately explained").

bear a heavy burden of persuasion." Id. at 356; see also In Re: Delta Airlines, 35 N.M.B. at 132 (declining request to change policy because change was not "essential.").  It appears therefore that the Board had adopted a policy of not amending its rules unless required to do so by statute or unless the policy change was otherwise essential.

In the Final Rule, the Board expressly stated that it "believes there are 'compelling reasons' to make this change to the representation election procedure at this time," 75 Fed. Reg. at 26,072, and that "the proposed change is essential to fulfilling its statutory mission to ascertain employee preference with regard to representation." Id. at 26,075.  Plaintiffs respond that these statements are conclusory and therefore are inadequate under the APA, and that the change cannot possibly be "essential" because the Board operated successfully under the Original Rule for 75 years.  The Court disagrees.  Throughout the Final Rule the Board provides evidence and analysis for why the New Rule will better determine employees' preference regarding representation — the reason it gives for why the proposed change is essential — and how changed circumstances have caused it to reach this conclusion despite the Original Rule's longevity.  See supra at 17-20.  The agency's decision that the change is essential is "presume[d] . . . valid[]." City of Portland v. EPA, 507 F.3d at 713 (quoting National Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007)).  In light of the deference it must accord the Board, the Court finds that the Board's stated reasons are adequate to show that the change is essential.  Although reasonable minds could disagree about how essential the change is, "a court is not to substitute its judgment for that of the agency." Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. at 43.

Even if one were to conclude that the Board's stated reasons do not show that the proposed change is essential, the Board has also explained why it does not believe it must follow the standard articulated in <u>Chamber of Commerce</u> that it would only amend a rule if the proposed changes were mandated by the RLA or were "essential to the Board's administration of representation matters." <u>See</u> 75 Fed. Reg. at 26,075 (citing <u>Chamber of Commerce</u>, 14 N.M.B. at 360). The Board explained that "it is not bound by its prior statements on this issue and is free to consider changed circumstances . . . in determining whether to change representation procedures, despite refusing to do so in the past." <u>Id</u>. (citing <u>American Trucking Ass'n v. AT & SFR Co.</u>, 387 U.S. 397, 416 (1967); <u>Ass'n of Nat'l Advertisers, Inc. v. FTC</u>, 627 F.2d 1151, 1174 (D.C. Cir. 1979)). It observed that the APA permits agencies to change their views "of what is best in the public interest . . . from time to time [because c]ommissions themselves change, underlying philosophies differ, and experience often dictates changes." <u>See</u> 75 Fed. Reg. at 26,075-76 (quoting <u>Ass'n of Nat'l Advertisers, Inc v. FTC</u>, 627 F.2d at 1174).

Even if the Board has articulated a standard for rulemaking in the New Rule that is more permissive of changes to circumstances and policy views than it previously endorsed, the Board has not run afoul of the APA because the revised internal standard now announced is based on a reasoned analysis and the Board has adequately explained its reasons for the change. <u>See</u> <u>FCC v. Fox TV Stations, Inc.</u>, 129 S. Ct. at 1811 (an agency's change in policy is permitted under the APA if "the new policy is permissible under the statute . . . there are good reasons for it, and . . . the agency *believes* it to be better, which the conscious change of course adequately indicates") (emphasis in original). The Court concludes that the Board's treatment of its own internal precedent was not arbitrary and capricious. <u>See</u> <u>Chemical Waste Mgmt., Inc. v. EPA</u>,

873 F.2d at 1481 (an agency is "free to change its interpretation [of a statute] in order to permit the use of [different] procedures . . . provided that its new interpretation is otherwise legally permissible and is adequately explained").

### 4.  Alleged Predetermination by the Majority of the Board

Plaintiffs argue that issuance of the New Rule was arbitrary and capricious because, in their view, two members of the Board acted with unalterably closed minds regarding the New Rule and predetermined the outcome of the rulemaking process.  The Court already has concluded that plaintiffs' allegations are insufficient to support discovery into this issue.  See Opinion and Order, Dkt. No. 44 (June 4, 2010).  For the same reasons explained in its Opinion and Order of June 4, 2010, it concludes that judgment should be granted for defendants on this issue as well.  See id.

## IV.  CONCLUSION

For the reasons stated above, the Court concludes that the Board has not violated either the Railway Labor Act or the Administrative Procedure Act in issuing the New Rule.  It therefore granted defendant's and defendant intervenors' motions for summary judgment and denied plaintiff's and plaintiff intervenors' motions for summary judgment by Order and Judgment of June 25, 2010.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  June 28, 2010